Hillsborough
No. 7441

BEDFORD SCHOOL DISTRICT

v.

CARON CONSTRUCTION CO., INC.

CARON CONSTRUCTION CO., INC.

v.

A. W. THERRIEN COMPANY, INC.

December 30, 1976

*Wiggin & Nourie* and *Gordon A. Rehnborg, Jr. (Mr. Rehnborg* orally) for the plaintiff School District.

*Hanrahan & Flynn (Mr. John W. Hanrahan* orally) for the defendant Caron Construction Co., Inc.

*Emile R. Bussiere* for defendant A. W. Therrien Company, Inc., filed no brief.

KENISON, C.J.    This is an action by the Bedford School District against Caron Construction Co., Inc., the general contractor, and Dirsa & Lampron, the architect, to recover damages arising from construction of a defective roof. Caron subsequently brought a third party action against A. W. Therrien Company, Inc., the roofing subcontractor. Shortly before trial, the plaintiff school district and the architect settled their dispute and entered into a "Guaranty Agreement." This agreement provides that the school district will (1) take a voluntary nonsuit with prejudice in its action against the architect, (2) prosecute its action against Caron, and (3) not settle with Caron for less than $20,000 without the consent of the architect. In return, Dirsa & Lampron agrees to pay the plaintiff school district $20,000, which sum would be reduced by the amount of any verdict the plaintiff collects from Caron. Thus, if the plaintiff collected $20,000 or more from Caron, the architect would have no obligation to the school district. The validity of the guaranty agreement was not raised in the lower court, and the defendants are therefore precluded from raising it here. *Wiggin v. Kent McCray, Inc.,* 109 N.H. 342, 348, 252 A.2d 418, 423 (1969); *A. Perley Fitch Co. v. Continental Ins. Co.,* 99 N.H. 1, 3, 104 A.2d 511, 512 (1954). In deciding this case, we express no opinion as to the validity of such agreements.

Before trial the defendants Caron and A. W. Therrien advised the court of their intention to call the architect as a witness and to introduce the guaranty agreement into evidence before the jury. The plaintiff moved to prevent introduction of the agreement, but the Trial Judge *(Flynn,* J.) denied the motion. The plaintiff then moved that, if the guaranty agreement is disclosed to the jury, the court should permit the plaintiff to introduce evidence explaining all of the relevant circumstances and reasons leading up to and motivating the execution of the guaranty agreement between the two parties. This motion was also denied. The

plaintiff's exceptions were reserved and transferred to this court.

The first issue is to what extent, if any, and for what purposes may the defendant disclose to the jury the existence and terms of the guaranty agreement. Caron seeks to introduce into evidence the entire agreement at least for the purpose of impeaching the credibility of the architect, if he testifies. In addition, there is some suggestion that the defendant wants the agreement to be admitted substantively as evidence of the architect's liability.

The plaintiff takes the position that the guaranty agreement is a settlement and therefore inadmissible on the issue of damages or liability (*Gagne v. New Haven Road Construction Co.*, 87 N.H. 163, 175 A. 818 (1934)) and is inadmissible for the purpose of impeachment because the architect, if he testifies at all, will be the defendant's witness, and under the common law rule a party may not impeach his own witness. *Whitman v. Morey*, 63 N.H. 448, 2 A. 899 (1885). If this court does permit impeachment, the plaintiff argues that the jury should be told only that the architect has a pecuniary interest in the outcome of the case and stands to gain from a verdict for the plaintiff. Most important to the plaintiff is that the $20,000 settlement figure remain undisclosed to the jury. Finally, if we permit the defendant to introduce the agreement to any extent or for any purpose, the plaintiff urges us to reverse the lower court's ruling that the plaintiff may not explain to the jury the circumstances surrounding the negotiations and the reasons for the settlement.

At the outset we note that the settlement in this case resembles a "Mary Carter" agreement which has been the subject of extensive commentary. *E.g.*, Freedman, *The Expected Demise of "Mary Carter": She Never was Well!* 1975 Ins. L.J. 602; Note, *Compromise and Settlement – Disapproval of "Mary Carter" Agreements*, 23 Def. L.J. 516 (1974); Comment, *Settlement Devices with Joint Tortfeasors*, 25 U. Fla. L. Rev. 762 (1973); Note, *The Mary Carter Agreement – Solving the Problems of Collusive Settlements in Joint Tort Actions*, 47 S. Cal. L. Rev. 1393 (1974). Recently, we decided a case, *Arapage v. Odell*, 114 N.H. 684, 327 A.2d 717 (1974), involving a settlement arrangement similar to a "Mary Carter" agreement but we did not consider the enforceability of the contract. A "Mary Carter" agreement, originating from the case *Booth v. Mary Carter Paint Co.*, 202 So. 2d 8 (Fla. Dist. Ct. App. 1967), is "a variant of the normal release or covenant not to sue." Note, *supra*, 47 S. Cal. L. Rev. at 1396. It is "basically a contract by which one co-defendant

secretly agrees with the plaintiff that, if such defendant will proceed to defend himself in court, his own maximum liability will be diminished proportionately by increasing the liability of the other co-defendants. Secrecy is the essence of such an arrangement, because the court or jury as trier of the facts, if apprised of this, would likely weigh differently the testimony and conduct of the signing defendant as related to the nonsigning defendants. By painting a gruesome testimonial picture of the other defendant's misconduct or, in some cases, by admissions against himself and the other defendants, he could diminish or eliminate his own liability by use of the secret 'Mary Carter Agreement.'" *Ward v. Ochoa,* 284 So. 2d 385, 387 (Fla. 1973).

We recognize that the settlement contract in this case is not a pure "Mary Carter" agreement. The agreeing defendant is no longer a party to the lawsuit. Also, the terms of the settlement have been disclosed to the judge and the other parties prior to the commencement of the trial. These variations substantially diminish the collusive characteristics inherent in "Mary Carter" agreements and therefore mitigate the prejudice to the rights and interests of the nonagreeing defendants. Note, *supra,* 47 S. Cal. L. Rev. at 1398-403. Nevertheless, under this contract, it is in the best interests of the architect to actively promote the plaintiff's case. *See* Freedman, *supra* at 610. To this extent the guaranty agreement is as potentially prejudicial as the typical "Mary Carter" agreement. Moreover, the contract provides two additional conditions not found in "Mary Carter" agreements that are clearly objectionable to the defendant Caron Construction Co., Inc.: The school district must prosecute its claims against Caron and cannot settle for less than $20,000 without the consent of the architect.

Although one court has declared "Mary Carter" agreements void on the grounds that they constitute champerty and maintenance and violate public policy *(Lum v. Stinnett,* 87 Nev. 402, 488 P.2d 347 (1971)), the Florida courts have refused to either condone or condemn such agreements generically. 62 A.L.R.3d 1111, 1118 (1975). Recently, the Supreme Court of Oregon declared a Mary Carter type agreement valid. *Grillo v. Burke's Paint Co., Inc.,* 551 P.2d 449 (Ore. 1976). Nevertheless, recognizing the substantial prejudice to nonagreeing defendants, courts and commentators are nearly unanimous in their belief that the agreements must be disclosed before trial at least to some extent. In addition, "[i]f the agreement shows that the signing defendant will

have his maximum liability reduced by increasing the liability of one or more co-defendants, such agreement should be admitted into evidence at trial upon the request of any other defendant who may stand to lose as a result of such agreement." *Ward v. Ochoa, supra* at 387; *see Grillo v. Burke's Paint Co., Inc., supra* at 452. However, these courts did not specifically consider to what extent or for what purpose the agreement is admissible.

Although some authorities advocate full disclosure *(Anderson v. Kemp,* 184 So. 2d 832 (Ala. 1966); Freedman, *supra* at 614-16), others recognize that full disclosure to the jury may be prejudicial to the nonagreeing defendant. The very existence of the agreement may suggest to the jury that at least one defendant feels that the plaintiff should recover and that the nonagreeing defendants should pay. Note, *supra,* 23 Def. L.J., at 528. Also, knowing that the agreement will be presented to the jury, the parties might fill it with self-serving recitals that inculpate the nonagreeing defendant. Note, *supra,* 47 S. Cal. L. Rev. at 1411; *see, e.g., Lum v. Stinnett,* 87 Nev. at 404 n.1, 488 P.2d at 348 n.1. Full disclosure might also unduly prejudice the plaintiff. For example, if the jury is told the amount which the defendant agreed to pay, it might erroneously conclude that the sum is the plaintiff's estimate of his damages. Thus, many courts have refused to permit disclosure of the dollar amount of "Mary Carter" agreements. Freedman, *supra* at 614. Even though the South Dakota Supreme Court was aware of the evils of such agreements and advocated disclosure of most of their details, it stated: "We can visualize no circumstances where the amount involved in a release or covenant needs to be disclosed to the jury." *Degen v. Bayman,* 200 N.W.2d 134, 139 (S.D. 1972); *see Moore v. Young,* 263 N.C. 483, 139 S.E.2d 704 (1965).

The plaintiff also might be prejudiced if the agreement is admitted substantively as evidence of liability because the jury might conclude that the responsible party has already come forward and settled and, if the other defendants were liable, they would have settled too. The final aspect of the disclosure problem is that admission of these contracts into evidence tends to discourage settlements, contrary to public policy. *Gagne v. New Haven Road Construction Co.,* 87 N.H. 163, 175 A. 818 (1934); note, *supra,* 25 U. Fla. L. Rev. at 774. A party is not likely to enter into a settlement if the agreement may be admitted before the jury as evidence of his liability. C. McCormick, The Law of Evidence § 274 (2d ed. 1972). Those cases that have considered the matter have

held that the "Mary Carter" type agreement is admissible only for the purpose of impeaching the testimony of the agreeing party. *Reese v. Chicago, Burlington & Quincy R.R. Co.,* 55 Ill. 2d 356, 364-65, 303 N.E.2d 382, 387 (1973); *see Pellett v. Sonotone Corp.,* 26 Cal. 2d 705, 160 P.2d 783 (1945).

After considering solutions to these problems proposed by numerous courts and commentators, we believe the following resolution appropriately balances the competing interests at stake. If the architect testifies at trial, the defendant may attempt to demonstrate bias or prejudice in favor of the plaintiff by revealing the fact that the architect has settled with the plaintiff, that he stands to gain financially from a verdict for the plaintiff and that he is thus in a position adverse to the defendant. *Maule Industries, Inc. v. Roundtree,* 264 So. 2d 445 (Fla. Dist. Ct. App. 1972). In this process, it is important that the sum agreed upon, $20,000, not be disclosed. Such disclosure would not further the jury's ability to judge the credibility of the witness but would unduly prejudice the plaintiff. *Degen v. Bayman,* 200 N.W.2d 134 (S.D. 1972); Note, *supra,* 47 S. Cal. L. Rev. at 1413. The existence of the settlement may be considered only on the issue of motive and credibility of the witness and not on the issue of liability; a limiting instruction to that effect should be given at the request of any party. *Reese v. Chicago, Burlington & Quincy R.R. Co.,* 55 Ill. 2d 356, 364-65, 303 N.E.2d 382, 387 (1973); C. McCormick, *supra* at § 274. The plaintiff may then attempt to rehabilitate its witness by explaining to the jury the circumstances surrounding the agreement, if such evidence would tend to demonstrate lack of bias on the part of the witness. *See* C. McCormick, *supra* at § 49.

The fact that the architect will be the defendant's witness does not prevent the defendant from impeaching him. Under the old common law rule, one generally could not impeach one's own witness. 3A Wigmore, The Law of Evidence § 896 (Chadbourn rev. 1970); *see Whitman v. Morey,* 63 N.H. 448, 2 A. 899 (1885). The historical explanation for the rule is unclear, and the analytical justification for the restriction has been characterized as a "contemptible failure." J. Maguire, J. Weinstein, J. Chadbourn & J. Mansfield, Cases and Materials on Evidence 423 (1973). The prohibition against impeaching one's own witness has been abolished in the federal courts (Fed. R. Evid. 607) and in California. Cal. Evid. Code § 785 (West). In many other jurisdictions the rule has been relaxed considerably. J. Maguire, J. Weinstein, J.

Chadbourn & J. Mansfield, *supra*, at 424. Under our statutes, a party may call and impeach an opposing party. RSA 516:24. Recently, we held that a party may call a nonparty witness and impeach him. *Pridham v. Cash & Carry Building Center, Inc.*, 116 N.H. 292, 359 A.2d 193 (1976). "The cross-examination of a witness by the party calling him may be rendered necessary by the hostility of the witness or other cause . . . ." *Gerrish v. Gerrish*, 63 N.H. 128 (1884). The potential for bias on the part of the witness in this case may be found to be sufficient to justify relaxation of the prohibition against impeaching one's own witness. C. McCormick, *supra* at § 37; *see* Note, *supra*, 25 U. Fla. L. Rev. at 777.

*Plaintiff's exceptions sustained in part and overruled in part.*

LAMPRON and BOIS, JJ., did not sit; the others concurred.