**Vermont Union School District No. 21 v. H. P. Cummings Construction Co.; Major L. Rodd, Inc., William G. Rodd, d/b/a Major L. Rodd, The Roofer; and GAF Corporation**

[469 A.2d 742]

No. 180-81

Present: **Billings, C.J., Hill, Peck and Gibson, JJ., and Larrow, J. (Ret.), Specially Assigned**

Opinion Filed September 9, 1983

Motion for Reargument Denied October 19, 1983

*Sten Lium,* St. Johnsbury, for Plaintiff-Appellee.

*John T. Sartore* and *S. Crocker Bennett II* of *Paul, Frank & Collins, Inc.,* Burlington, and *Kolvoord, Overton & Wilson,* Essex Junction, for Defendants-Appellees Rodd.

*Plante, Richards, Terino & Hanley,* White River Junction, and *Harold Hestnes, Robert F. McLaughlin, John J. Regan, Nancy D. Israel* and *Christopher Weld, Jr.,* of *Hale and Dorr,* Boston, Massachusetts, for Defendant-Appellant GAF Corp.

**Hill, J.** The Vermont Union School District No. 21 (school district) instituted this action on July 26, 1976, against its general contractor, the H. P. Cummings Construction Company (Cummings), and Cummings' roofing subcontractor, Major L. Rodd, Inc. (Rodd), for alleged defects in the school district's Blue Mountain School roof. Its complaint alleged that the new roof had widespread leakage problems caused by the roof's blistering and bubbling surface. The complaint further alleged that both defendants had been negligent, had breached warranties, and had failed to construct the roof in a workmanlike manner. In response, Cummings and Rodd sought indemnity from the GAF Corporation (GAF), Rodd's supplier of roofing materials for the Blue Mountain School.

On October 1, 1976, GAF moved to dismiss the indemnity claims by asserting as affirmative defenses that it lacked contractual privity with Cummings, that Rodd's negligent installation barred indemnity, and that all applicable statutes of limitation had expired as to any claims against GAF. Its motion for summary judgment on the indemnity claims was denied on December 13, 1976, and its subsequent attempts to secure permission for an interlocutory appeal were denied by both the trial court and this Court. Thereafter, the parties engaged in a protracted period of negotiation and discovery.

After extensive review of the documents secured from GAF through discovery, the parties took several procedural steps which significantly altered the posture of this action. On March 3, 1980, and June 6, 1980, the trial court permitted Rodd and the school district to amend their pleadings to seek direct relief and punitive damages against GAF. The school district, Rodd and Cummings then negotiated an agreement detailing each party's liabilities and obligations. In the agreement, which was later memorialized and filed with the trial court on November 10, 1980, Rodd and Cummings waived all defenses to the school district's complaint and admitted all liability. The school district then agreed that the judgments stipulated to would be fully satisfied and discharged in return for the good faith prosecution by Cummings and Rodd of all claims pending against GAF. The agreement further outlined a distribution formula for all damages ultimately collected from GAF.

In response, GAF moved to have the agreement declared void, to have all claims against it dismissed as being extin-

guished by the agreement, and again to have the claims of Rodd and the school district dismissed on statute of limitation grounds. On January 7, 1981, GAF's motion was denied. GAF then cross-claimed against Rodd, seeking indemnity for improper application of the roof, alleging that Rodd breached warranties and negligently failed to follow GAF's specifications.

The trial commenced on February 3, 1981. On March 25, 1981, the jury, in answer to special interrogatories, returned an award of approximately $2,295,000 against GAF, of which $1,600,000 constituted punitive damages (to be split evenly, according to the agreement, between the school and Rodd). Of the remainder, $195,000 was awarded to the school for the cost of roof replacement, and approximately $500,000 was awarded to Rodd as compensatory and indemnity damages. GAF moved for remittitur of all punitive damages and all further damages awarded to Rodd, and additionally moved for a new trial. In a post-trial order dated May 7, 1981, the trial court denied the motions, and GAF subsequently filed a timely notice of appeal. We reverse.

In light of our disposition of this case, a detailed version of the facts is unnecessary. The following facts, taken in the light most favorable to the prevailing parties, is sufficient. *Quechee Lakes Corp.* v. *Terrosi*, 141 Vt. 547, 552, 451 A.2d 1080, 1083 (1982). In August of 1970, plaintiff contracted with Cummings to build the Blue Mountain School. Cummings in turn contracted with Rodd to supply a "four ply" roof. Prior to the roof's construction, plaintiff, plaintiff's architect, and Cummings assented to Rodd's request to supply a "three ply" roof rather than the original four ply roof. The change was made on the understanding that the three ply roof, advertised as the most advanced technique in "built up" roofing, would best serve the school's purposes.

Both the four and three ply roofs involve a combination of asphalt-saturated "felts," which are applied over a roof deck in layers or plies, through the use of hot asphalt or other adhesive products. The felts consist of wood pulp or cellulose-like substances bound together and wound in long rolls approximately three feet in width, which are then inserted into asphalt. During the application process, they are rolled into the asphalt and then "broomed" into place to assure adhesion. The

technique was developed in an attempt to create a heavier, more waterproof sheet. Throughout the 1960's the coated felts were promoted and marketed to roofers as being both more water resistant and more cost efficient, requiring fewer layers or plies than the prevailing standard roofs.

On September 21, 1970, construction of the Blue Mountain School's roof was completed. Within six months, however, a substantial blistering and bubbling problem appeared on the roof's surface which resulted in widespread water leaks to the school's interior. Throughout 1971 and 1972, the problem grew progressively worse despite Rodd's attempts to repair the roof. As a result of the leaking, the school incurred extensive damage to the interior ceiling tiles and library materials, and at one point there were leaks in almost every room in the school. In short, the faulty roofing adversely affected the overall functioning of the school's activities. At Rodd's request, GAF performed numerous tests on the roof's surface to determine the cause of the problem, but the results of the tests were allegedly suppressed by GAF. In 1975, GAF further attempted to repair the blistering surface condition by use of "mastic injection" of the roof's blisters. This new and untried process proved unsuccessful.

At the trial's commencement, the school district, Rodd and Cummings, pursuant to their pretrial agreement, essentially sat collectively as plaintiffs proceeding against GAF. Their position was that GAF knew, prior to its marketing of the coated felt roof systems, that such systems were unproven and inadequately tested. They alleged actual knowledge on the part of GAF that unperforated coated felts, when used in multiple plies rather than as a base sheet, have a tendency to trap moisture, thus causing the coated felt roofs to blister and fail long before the industry standard roof life of twenty years. Moreover, they asserted that the decision to market the coated felt systems as "the most advanced technique in built up roofing" was made by GAF executives over the vocal opposition of GAF's research scientists who foresaw the potential difficulties. Based on information from GAF's internal business memoranda, plaintiffs further alleged that GAF knew of the blistering problems in the late 1960's, well before it sold the roof materials involved herein to Rodd. They accordingly pro-

ceeded against GAF on the theories of fraud, strict liability, breach of warranty and negligence.

## I.

On appeal, the parties have comprehensively briefed many issues. Some of the issues raise questions about specific occurrences at trial, and some present issues of first impression for this Court. After prolonged study, however, this Court unanimously agrees that the trial court's verdict for plaintiffs must be reversed without discussion of many of these issues. Simply stated, this case was tried before an improperly constituted court. Just prior to trial, the court consisted of one presiding judge and two assistant judges as required by 4 V.S.A. § 111(a). See *Suitor* v. *Suitor*, 137 Vt. 110, 111, 400 A.2d 999, 1000 (1979). During the trial, however, one of the assistant judges suffered a stroke which rendered him incapable of continuing his duties. The court was thus reduced to one presiding judge and one assistant judge. Despite GAF's objection, the presiding judge, acting pursuant to an internal administrative directive that had no force of law, dismissed the remaining assistant judge and proceeded with the trial.[1]

When the trial commenced, 4 V.S.A. § 111(a), which sets forth the statutory prerequisite for a properly constituted court, stated that: "A superior court shall be held in each county at the times and places appointed by law, consisting of one presiding judge and the two assistant judges, if available." 4 V.S.A. § 111(a) (amended 1979, No. 181 (Adj. Sess.), § 6, effective July 1, 1980).[2] GAF contends that the presiding

---

[1] The directive, issued by the chief administrative judge of the trial courts, stated in pertinent part as follows: "If one of the assistant judges of the county is unavailable, the Superior Court Judge designated the Presiding Judge of the term for that county shall sit alone . . . ." Trial Court Administrative Directive No. 1, § 2(b)(4) (issued pursuant to 12 V.S.A. App. VIII, A.O. 18 and 1980 Vt. Acts No. 181). This directive was subsequently withdrawn.

[2] The current version of § 111(a) was amended after the trial of this cause to include the following sentences:

If two assistant judges are not available, court shall be held, consisting of one presiding judge and one assistant judge, if available. In the event that court is held by one presiding judge and one assistant judge, and they do not agree on a decision, a mistrial shall be declared.

judge's dismissal of an available assistant judge was erroneous, since it rendered the court's composition improper. GAF notes that the language of § 111(a) provides no authority for the discharge of an available assistant judge when the other assistant judge becomes unavailable. Since the second assistant judge clearly was available, GAF insists that the court was improperly constituted, and that a mistrial must be declared. We agree.

 This Court has consistently held that the essential power of a court to hear a case is granted by force of law, and thus is not subject to stipulation or conduct of the parties involved. *Suitor* v. *Suitor, supra,* 137 Vt. at 111, 400 A.2d at 1000; *Lafko* v. *Lafko,* 127 Vt. 609, 612, 256 A.2d 166, 168 (1969). Compliance with 4 V.S.A. § 111(a) is a jurisdictional prerequisite to the hearing of any case, and absent such compliance, the "superior court has no authority to hear and decide a matter." *Bennett Estate* v. *Travelers Insurance Co.,* 140 Vt. 339, 343, 438 A.2d 380, 382 (1981) (citing *Winooski Urban Renewal Agency* v. *Green Mountain Power Corp.,* 134 Vt. 497, 497, 365 A.2d 514, 515 (1976)). Thus, orders issued from an improperly constituted court are void, since they lack any basis in law. *Id.; Suitor* v. *Suitor, supra,* 137 Vt. at 111, 400 A.2d at 1000.

 In the instant case, trial began with a properly constituted court. A subsequent illness rendered one assistant judge unavailable but, as noted above, nothing in the record indicates that the other assistant judge was unavailable. Therefore, the trial should have proceeded with the court consisting of the presiding judge and the remaining assistant judge, because there was no binding authority to dismiss a clearly available assistant judge. Accordingly, a mistrial must be declared.

## II.

Although we are precluded from reviewing many of the issues of law presented in this appeal, it is appropriate that we

4 V.S.A. § 111(a) (amended 1981, No. 60, effective July 1, 1981). The amendments did not alter the statutory composition of the court; rather, they further codified what had been recognized in prior statutes, common law, and historical practice. See, e.g., *Suitor* v. *Suitor, supra.*

review one of these issues because it is likely to recur at retrial. *State* v. *Carmody*, 140 Vt. 631, 637, 442 A.2d 1292, 1295 (1982). That issue concerns the validity of the agreement between the school, Rodd, and Cummings. On November 10, 1980, the school, Cummings and Rodd entered into a written stipulation which was filed with the court on that date, sanctioned by the court in its pretrial order of January 7, 1981, and ultimately admitted into evidence during the course of the trial. Although the stipulation was not reduced to writing until November, the parties to it had orally agreed to its terms in the summer of 1980. On August 12, 1980, GAF filed interrogatories inquiring into the nature and substance of the agreement and, in its answer, dated September 15, 1980, the school disclosed the essential terms of the stipulation. Thus, GAF was aware of the stipulation and apprised of its terms at least five months prior to the commencement of trial.

The written stipulation briefly recounted the factual background of the case, and asserted that the roofing materials provided by GAF "were defective, in part because they contained excessive moisture." The stipulation also acknowledged the legal liability of Cummings and Rodd to the school "for such compensatory damages as are finally determined in this litigation to have been proximately caused by the fact that the roof . . . contained such defective materials. . . ." Rodd, in turn, acknowledged liability to Cummings "for the same reason." The school then asserted that it would not seek punitive damages against Cummings or Rodd as a consequence of their liability. In consideration of Cummings' and Rodd's stipulations, the school agreed that any judgments in its favor against Cummings and Rodd would be "fully satisfied and discharged" by the good faith prosecution by Cummings and Rodd of all claims of the school and of Cummings and Rodd against GAF, and the payment over to the school of all amounts which were ultimately recovered and collected from GAF by Cummings and Rodd in compensation for the school's damages. The stipulation then outlined that such good faith prosecution would include investigating, providing witnesses and retaining experts, presenting evidence relating to all triable claims, and appealing and retrying the case, if necessary, to obtain a final determination of the school's damages.

The final provisions of the stipulation were as follows:

6. If H. P. Cummings or Rodd recover and collect from GAF any amounts for the said School District damages, whether by negotiation and settlement or by verdict and judgment, said amounts shall be paid over to the School District, less offsets if any, and the School District shall accept such sum in full payment, satisfaction and discharge of the judgments in its favor against H. P. Cummings and Rodd stipulated to herein and H. P. Cummings and Rodd and each of them will thereupon be fully released and discharged from any and all liability to the School District for the said School District damages. Such payment shall also be in full payment, discharge and satisfaction of the judgment in favor of H. P. Cummings against Rodd stipulated to herein for said School District damages. It is agreed that such payments to the School District shall be conditioned upon, limited to and payable from and only from any sums actually collected from GAF by H. P. Cummings or Rodd for said School District damages and if no collection is obtained for said School District damages by H. P. Cummings or Rodd from GAF the attempts by H. P. Cummings or Rodd to collect and recover from GAF for such amounts shall constitute payment, satisfaction and discharge of the judgments stipulated to herein and H. P. Cummings and Rodd shall be fully released and discharged from any liability to the School, and Rodd shall be fully released and discharged from any liability to H. P. Cummings, in connection with the construction of the school building. It is understood and agreed that neither H. P. Cummings or Rodd are under any obligation to pay over to the School District any sums they or either of them may collect from GAF which are not for the said School District damages but rather for other compensatory damages sustained by H. P. Cummings or Rodd, whether obtained by negotiation and settlement or verdict and judgment, and that distribution of any punitive damages which may be recovered by any of the parties to this stipulation shall be governed by the provisions of the next paragraph.

7. The School District, H. P. Cummings and Rodd may each present any claim they have for punitive damages against GAF. All punitive damages recovered from GAF,

whether by negotiation and settlement or by verdict and judgment, shall be divided evenly between the School District and Rodd. In the event the jury should find punitive damages separately, the parties hereby agree that the court may combine said punitive damages and divide them evenly between the School District and Rodd. In the event the Court should not approve this division of punitive damages, it shall not negate this stipulation but it shall be viewed separately and may be subject to separate amendment by the parties hereto.

8. It is not the intention of the parties that this agreement be viewed as a waiver of any of the terms and provisions of the contracts between the parties, nor is it a release, but rather an agreement which stipulates the liability of certain defendants and provides a method for those defendants to discharge that liability.

GAF moved to declare the stipulation void as adverse to GAF's right to a fair trial and violative of public policy. By an order dated January 7, 1981, the court denied this motion, finding that the agreement underlying the stipulation was valid. However, the court refused to accept the provisions of paragraph 7 regarding the division of any punitive damage award between Rodd and the school, and cautioned the jury that the clause was not binding. The court also acknowledged that because of the stipulation, trial procedure would have to be modified; ultimately, all the parties to the stipulation were designated as plaintiffs for the purposes of trial, and the entire stipulation was introduced as evidence, used by GAF in examining witnesses, and submitted to the jury as Exhibit 1.

On appeal GAF renews its argument that, by failing to declare the stipulation void as a matter of law, the court denied GAF's right to a fair trial. It characterizes the stipulation as a "Mary Carter agreement," a term coined by a Florida court in the case of *Maule Industries, Inc.* v. *Rountree*, 264 So. 2d 445 (Fla. Dist. Ct. App. 1972), *rev'd on other grounds*, 284 So. 2d 389 (Fla. 1973) (referring to the agreement in *Booth* v. *Mary Carter Paint Co.*, 202 So. 2d 8 (Fla. Dist. Ct. App. 1967)). Plaintiffs contend that the stipulation is not a Mary Carter agreement, that neither its provisions nor its spirit contravenes public policy, and that GAF's right to a fair trial

was not compromised. Since this question is one of first impression for this Court, to pass on it we must review both the current state of the law regarding Mary Carter agreements, and the policy considerations underlying their use.

Although this Court has not yet addressed the validity of Mary Carter agreements, the issue has been litigated extensively in other jurisdictions, see, e.g., *Breitkreutz* v. *Baker*, 514 P.2d 17 (Alas. 1973); *City of Tucson* v. *Gallagher*, 108 Ariz. 140, 493 P.2d 1197 (1972); *Pease* v. *Beech Aircraft Corp.*, 38 Cal. App. 3d 450, 113 Cal. Rptr. 416 (1974); *Ward* v. *Ochoa*, 284 So. 2d 385 (Fla. 1973); *Gatto* v. *Walgreen Drug Co.*, 61 Ill. 2d 513, 337 N.E.2d 23, *cert. denied*, 425 U.S. 936 (1975); *Burkett* v. *Crulo Trucking Co.*, 171 Ind. App. 166, 355 N.E.2d 253 (1976); *General Motors Corp.* v. *Lahocki*, 286 Md. 714, 410 A.2d 1039 (1980); *Pacific Indemnity Co.* v. *Thompson-Yaeger, Inc.*, 260 N.W.2d 548 (Minn. 1977); *Lum* v. *Stinnett*, 87 Nev. 402, 488 P.2d 347 (1971); *Bedford School District* v. *Caron Construction Co.*, 116 N.H. 800, 367 A.2d 1051 (1976); *Cox* v. *Kelsey-Hayes Co.*, 594 P.2d 354 (Okla. 1978); *Grillo* v. *Burke's Paint Co.*, 275 Ore. 421, 551 P.2d 449 (1976); *Degen* v. *Bayman*, 86 S.D. 598, 200 N.W.2d 134 (1972); *General Motors Corp.* v. *Simmons*, 558 S.W.2d 855 (Tex. 1977); *Trampe* v. *Wisconsin Telephone Co.*, 214 Wis. 210, 252 N.W. 675 (1934), and has been the subject of much commentary. See, e.g., May, *Mary Carter Agreements: A Viable Means of Settlement?*, 14 Tulsa L.J. 744 (1979); Miller, *Mary Carter Agreements: Unfair and Unnecessary*, 32 SW. L.J. 779 (1978); Carson, *Are Gallagher Covenants Unethical? An Analysis Under the Code of Professional Responsibility*, 19 Ariz. L. Rev. 863 (1977); Freedman, *The Expected Demise of "Mary Carter": She Never Was Well!*, 633 Ins. L.J. 602 (1975); Grant, *The Mary Carter Agreement—Solving the Problems of Collusive Settlement in Joint Tort Actions*, 47 S. Cal. L. Rev. 1393 (1974); Herndon, *"Mary Carter" Limitation on Liability Agreements Between Adversary Parties: A Painted Lady is Exposed*, 28 U. Miami L. Rev. 988 (1974); see also Annot., 65 A.L.R.3d 602 (1975).

■ In essence, a Mary Carter agreement is a contract by which one or more defendants in a multi-party case secretly align themselves with the plaintiff and agree to continue as active defendants in the suit while working to aid in the plain-

tiff's case; in exchange, their own maximum liability will be diminished proportionately by increasing the liability of the nonagreeing defendant or defendants. *Cox* v. *Kelsey-Hayes Co., supra,* 594 P.2d at 357 (citing *Ward* v. *Ochoa, supra,* 284 So. 2d 385). The agreements themselves take a variety of forms; however, four features are commonly considered to be essential:

1. The agreeing defendants must remain in the action in the posture of defendants.

2. The agreement must be kept secret.

3. The agreeing defendants guarantee to the plaintiff a certain monetary recovery regardless of the outcome of the lawsuit.

4. The agreeing defendants' liability is decreased in direct proportion to the increase in the nonagreeing defendants' liability.

See, e.g., *General Motors Corp.* v. *Lahocki, supra,* 286 Md. at 720, 410 A.2d at 1042; *Cox* v. *Kelsey-Hayes Co., supra,* 594 P.2d at 357; *Frier's, Inc.* v. *Seaboard Coastline Railroad,* 355 So. 2d 208, 210 (Fla. Dist. Ct. App. 1978); Miller, *supra,* at 783–85; Freedman, *supra,* at 609–10; Grant, *supra,* at 1396–97.

The facts of a Nevada decision, *Lum* v. *Stinnett, supra,* typify such arrangements. In *Lum,* plaintiff and two codefendant physicians effectively conspired to shift the malpractice liability to a third defendant physician. Under the Mary Carter agreement, the two physicians agreed to pay plaintiff $20,000 if the jury awarded plaintiff nothing or less than $20,000; but if the jury verdict exceeded $20,000, these two physicians would pay nothing. Plaintiff further agreed not to settle with the third defendant physician for less than $20,000 without the written consent of the two signing physicians. The two physicians were present as defendants at trial, but plaintiff virtually disregarded them. At the close of his case, plaintiff dismissed all charges against them and recovered a judgment of $50,000 against the remaining physician. That judgment was ultimately reversed on appeal, in an opinion which caustically denounced Mary Carter agreements and declared them void per se as against public policy.

Not surprisingly, Mary Carter agreements have been widely

criticized as champertous, violative of public policy, and a distortion of the adversary relationship between plaintiffs and defendants which results in a collusive proceeding adversely affecting the nonagreeing defendant's right to a fair trial. See *Grillo* v. *Burke's Paint Co., supra,* 275 Ore. at 426, 551 P.2d at 452; see also *Lum* v. *Stinnett, supra.*

> In effect, the "Mary Carter agreement" is a *partial* settlement of a dispute between a plaintiff and at least one of the defendants. The role of the contracting defendant is comparable to that of the role of an actor in a real play. He is a favored party to the litigation as he hides behind his mask, thereby precluding the court, the jury, and the noncontracting defendant or defendants from recognizing what has conspiratorily transpired to their detriment. The contracting defendant or defendants are defendants in name only, since they, by "agreement," actively promote the plaintiff's case. They may very well abandon or not even assert certain obvious defenses, such as contributory negligence, assumption of the risk, or even misuse of the product. They may readily admit the reasonableness of the damages claimed by the plaintiff. In either event, the "conduct" of the contracting defendant or defendants must influence the judge and jury, especially in those situations where the judge and jury are unaware of the executed "Mary Carter agreement." Therefore, any recovery by the plaintiff is tainted because it also accrues to the benefit of the contracting defendant or defendants at the expense of the noncontracting defendant or defendants.

Freedman, *supra,* at 610. On the issue of secrecy, one court noted:

> Secrecy is the essence of such an arrangement, because the court or jury as trier of the facts, if apprised of this, would likely weigh differently the testimony and conduct of the signing defendant as related to the non-signing defendants. By painting a gruesome testimonial picture of the other defendant's misconduct or, in some cases, by admissions against himself and the other defendants, he could diminish or eliminate his own liability by use of the secret "Mary Carter Agreement."

*Ward* v. *Ochoa, supra,* 284 So. 2d at 387.

Although Mary Carter agreements are frequently denounced, only two states have condemned their use outright by ruling them void per se. *Lum* v. *Stinnett, supra; Trampe* v. *Wisconsin Telephone Co., supra.* See generally Freedman, *supra,* and Miller, *supra,* who argue that all such agreements should be held illegal per se. The majority of jurisdictions regard such agreements cautiously, choosing to treat them on a case by case basis rather than by categorical condemnation or absolute approval. In this regard, the reasoning of the Florida court in *Maule Industries, Inc.* v. *Rountree, supra,* is instructive:

> We are not inclined to paint with a brush that broad [as per se illegality]. Obviously the number of variations of the so-called "Mary Carter Agreement" is limited only by the ingenuity of counsel and the willingness of the parties to sign, and we therefore feel that we can neither condone nor condemn such agreements generically. We simply say that we do not find the agreement in this case to be void.

264 So. 2d at 447. See also *Frier's, Inc.* v. *Seaboard Coastline Railroad, supra,* 355 So. 2d at 211; *Cox* v. *Kelsey-Hayes Co., supra,* 594 P.2d at 358; *Grillo* v. *Burke's Paint Co., supra,* 275 Ore. at 427, 551 P.2d at 452; Carson, *supra,* at 867–68; Grant, *supra,* at 1409–10.

As one commentator noted, "[t]he better solution is to attack only those aspects of the typical agreement that unfairly prejudice the nonagreeing defendant" and skew the results of trial. Grant, *supra,* at 1410. Thus, a majority of those jurisdictions considering the issue have fashioned a rule requiring that such agreements be subject to pretrial discovery and, with some qualifications, admitted into evidence. E.g., *Sequoia Manufacturing Co.* v. *Halec Construction Co.,* 117 Ariz. 11, 570 P.2d 782 (1977); *General Motors Corp.* v. *Lahocki, supra,* 286 Md. at 730, 410 A.2d at 1046; *Bedford School District* v. *Caron Construction Co., supra,* 116 N.H. at 803, 367 A.2d at 1054; *Cox* v. *Kelsey-Hayes Co., supra,* 594 P.2d at 359; *Grillo* v. *Burke's Paint Co., supra,* 275 Ore. at 427, 551 P.2d at 452; *General Motors Corp.* v. *Simmons, supra,* 558 S.W.2d at 858–59. But see *Lum* v. *Stinnett, supra,* 87 Nev. at 409, 488 P.2d at 352; Miller, *supra,* at 795–96. Some jurisdictions allow ad-

mission for the sole purpose of attacking the credibility of witnesses, and require a limiting jury instruction to that effect. See, e.g., *Bedford School District* v. *Caron Construction Co., supra,* 116 N.H. at 805–06, 367 A.2d at 1054–55. Others allow the agreements in to prove the fact of their existence but require the excision of any inculpatory or self-serving statements and statements concerning the monetary amount of settlement, recognizing the inherently prejudicial nature of such information. See, e.g., *Cox* v. *Kelsey-Hayes Co., supra,* 594 P.2d at 360; *Degen* v. *Bayman, supra,* 86 S.D. at 607, 200 N.W.2d at 139. See also May, *supra,* at 763–67; Grant, *supra,* at 1410–13. Still other jurisdictions leave the extent of the agreement's admissibility to the discretion of the trial court. See *Frey* v. *Snelgrove,* 269 N.W.2d 918, 922 (Minn. 1978).

Having thus considered the policies and law surrounding Mary Carter agreements, we do not agree with GAF that the stipulation entered into here between the school, Cummings and Rodd was such a collusive instrument. The agreement was not secret; GAF was apprised of its essential terms a full five months before trial, and the document was filed with the court and incorporated into the court's pretrial order two months before trial. Nor did the parties to the agreement attempt to deceive the court by masquerading Rodd or Cummings as nominal defendants; once the stipulation was entered into, these two parties were explicitly realigned as plaintiffs, and so conducted themselves throughout the trial. Finally, the school was not guaranteed a fixed monetary recovery by the stipulation, regardless of the outcome of trial. Rather, its recovery, if any, was left wholly to the determination of the fact finder.

The only questionable provision in the stipulation pertained to the splitting of any punitive damage award between the school and Rodd. To the extent that this provision was valid, it effectively decreased Rodd's liability in direct proportion to the increase in GAF's liability. However, as noted above, the trial court rejected this provision. Moreover, the parties to the agreement themselves acknowledged the questionable validity of this clause by declaring it to be severable. We agree that the propriety of this provision is dubious, and we approve the trial court's rejection of it. See Grant, *supra,* at 1415–17.

 Since the trial court rejected the provision to split the punitive damage award, the agreement as limited thereby had none of the characteristics of a Mary Carter agreement, and threatened none of the interests sought to be preserved when such overt contracts exist. Moreover, even if we were to consider the stipulation as akin to a Mary Carter agreement, we would not be compelled to agree with GAF that its rights were unduly prejudiced thereby. As noted above, the majority of courts do not apply a per se prohibition of such agreements, but rather fashion a procedure for safeguarding the rights of the noncontracting defendant. In part this reflects a determination that such agreements are not wholly without salutory effect. As one court noted, "they encourage out-of-court settlements and help solve the economic need of an injured person confronted with the delays in the court system." *Grillo* v. *Burke's Paint Co., supra,* 275 Ore. at 427, 551 P.2d at 452.

In this case, all the procedures used to minimize the prejudice to a noncontracting defendant were employed: the agreement was disclosed to GAF upon proper discovery motions; the document was filed in court; and Rodd and Cummings were realigned as plaintiffs at the trial. Finally, the questionable provision regarding punitive damages splitting was rejected by the court.

Thus, on the particular facts before us, we find nothing illegal or improper about the pretrial stipulation entered into here. We recognize, however, the exclusion of evidence regarding settlement agreements. See V.R.E. 408; *Slayton* v. *Ford Motor Co.,* 140 Vt. 27, 29, 435 A.2d 946, 947 (1981) (jury may not be informed of a settlement agreement between one of several defendants and a plaintiff) ; see also *Griffith* v. *Nielsen,* 141 Vt. 423, 428, 449 A.2d 965, 968 (1982) ("[u]naccepted offers of settlement or compromise are inadmissible since public policy strongly favors settlement of disputed claims without litigation") (citing *Dutch Hill Inn, Inc.* v. *Patten,* 131 Vt. 187, 192, 303 A.2d 811, 814 (1973) ). Therefore, on retrial, the agreement should not be admitted into evidence, nor should the jury be advised of its existence, since the jury might draw improper inferences if it is informed of the settlement. See *Slayton, supra.*

*Reversed and remanded.*