Alma HACKMAN, Plaintiff-Respondent,

v.

Babu R. DANDAMUDI, M.D., Defendant-Appellant.

No. 50457.

Missouri Court of Appeals, Eastern District, Division Three.

Nov. 12, 1986.

Motion for Rehearing and/or Transfer Denied Dec. 16, 1986.

Case Transferred to Supreme Court Feb. 17, 1987.

Case Retransferred to Court of Appeals May 27, 1987.

Original Opinion Reinstated June 1, 1987.

Brent W. Baldwin, St. Louis, for defendant-appellant.

Robert F. Ritter, St. Louis, for plaintiff-respondent.

PUDLOWSKI, Presiding Judge.

Dr. Babu R. Dandamudi appeals from a judgment entered in the Circuit Court of the City of St. Louis following a jury trial and verdict for both actual and punitive damages against him, and his co-defendant, Professional Care Centers, a corporation doing business as Oak Park Professional Care Nursing Home, hereinafter Oak Park, and in favor of the plaintiff, Alma Hackman on a medical malpractice claim. We affirm.

The action was brought by Carolyn Hackman, plaintiff's daughter, in her legal capacity as plaintiff's guardian and conservator. During the pendency of this appeal, plaintiff died. However, Carolyn Hackman, now acting as the representative of plaintiff's estate continues to defend this appeal.

The events that led to the action began in February 1983 when appellant, plaintiff's personal physician, recommended that plaintiff be placed in a nursing home. At that time, plaintiff, who was a diabetic, was also suffering from incontinence and her behavior was often irrational. After visiting several homes and consulting with appellant, Carolyn Hackman chose Oak Park. However, between February and early June of 1983, when Carolyn left for a summer vacation in Colorado, she became increasingly concerned about the cleanliness of the home and the monitoring of her mother's condition. Because of her concern, she wrote both the director of nursing at Oak Park and appellant on June 12, 1983 from Colorado. After receiving the letter addressed to him, appellant contacted Carolyn and reassured her that he would keep a close watch on plaintiff during the summer.

On June 22, 1983, appellant was contacted by someone at Oak Park and informed that plaintiff had a blister on her right heel. Appellant ordered a heel protector and directed the use of a stoma adhesive, a sticky type bandage which would cover the blister. He also stated that he would check on plaintiff in a day or two. On June 25, he examined plaintiff's right foot and discovered a second sore that had not been reported to him. He attempted to check the peripheral pulse in the foot, and was unable to find one. He ordered the continued use of the heel protector and prescribed an antibiotic to be administered for ten days.

Appellant had no further contact with the home in regard to plaintiff's condition until July 29, 1983 when Carolyn noticed bloody sheets on plaintiff's bed when she visited Oak Park. At that time, she ordered the home to call appellant. Appellant was then contacted and informed that there was bloody pus oozing from the blister. Appellant informed Oak Park that he would visit plaintiff the next day. When he did so, he ordered her transferred to a hospital, where it was later determined that the foot was gangrenous and that amputation was necessary. An above the knee amputation was performed on August 2, 1983. It was determined that the source of the infection which had led to the gangrenous condition was plaintiff's own feces.

Three former Oak Park employees testified that there had been complaints about the home's cleanliness and about patients being left in wet beds. There was no record that plaintiff's urine sugar had been monitored between June 27 and July 30, 1983 and her vital signs were not checked during the month of July.

Evah Johnson, a family friend, testified that the first time she visited the home, plaintiff was lying in her own feces.

The jury awarded $250,000 in actual damages and assessed $75,000 in punitive damages against each defendant. The fault was apportioned thirty percent to appellant and seventy percent to Oak Park. However, prior to the trial, Oak Park and plaintiff's representatives had entered into an agreement whereby Oak Park had agreed to pay plaintiff $100,000 in installments secured by promissory notes and a deed of trust. The agreement also provided that if more than $100,000 in damages was assessed against Oak Park, plaintiff would execute on the judgment only against Oak Park's insurer which was in liquidation at the time. The agreement further provided that plaintiff would execute against appellant only for appellant's proportionate share of the fault and that any amount less expenses recovered from appellant, up to $100,000, would be used to offset the $100,000 that Oak Park had agreed to pay.

When the trial began, the agreement had not yet been reduced to writing, but appellant, his counsel, and the trial judge were informed of the essential elements of the agreement and it was later reduced to writing.

Appellant relies on three points:

I: Appellant should be entitled to a new trial, because the trial from which this appeal was taken, was conducted under the influence of an agreement between plaintiff and co-defendant which should be held invalid as contrary to public policy.

II. If Mary Carter agreements are allowable in Missouri, the trial court erred in failing to order a separate trial, in preventing appellant from introducing portions of the agreement into evidence, and in prohibiting cross examination regarding the agreement as to any witness who might be affected thereby.

III: The trial court erred in allowing plaintiff, over appellant's objection, to read into evidence a lengthy deposition passage wherein a subsequent treating doctor gives a detailed description of the amputation.

We first note that none of appellant's points relied on are in compliance with the requirements of Rule 84.04(d) which are mandatory.

Appellant's first point fails to state what "actions or rulings of the trial court are sought to be reviewed." In his reply brief, he attempts to remedy this by restating his point to read "[t]he trial court erred in failing to grant a mistrial and/or to declare the agreement between plaintiff and home invalid as contrary to public policy...."

The record before this court, however, is devoid of any indication that appellant ever requested such relief, either at trial or in his motion for a new trial. A trial court, except in exceptional circumstances, will not be faulted for failing to grant relief which was never requested. *See, State v. Gordon,* 649 S.W.2d 903, 907 (Mo.App. 1983). However, because a public policy issue is involved, appellant's failure to properly preserve and present this issue is not critical. *See, White v. McCoy Land Company,* 101 S.W.2d 763, 765 (Mo.App. 1937). Appellant's first point, however, can also be faulted for its failure to give any indication of *why* Mary Carter Agreements are against public policy.

Appellant's second point states wherein the trial court allegedly erred, but, like point one, it fails to state why the trial court's failure to order a severance was error. Appellant's final point also fails to state why it was error to admit the deposition testimony which described the amputation. However, these inadequacies in the wording of appellant's points are corrected at least partially by appellant's points in his reply brief.

Appellant's violations of Rule 84.04(d) would, as respondent suggests, justify dismissal of his appeal. However, rather than taking the time to give appellant notice of his violations and an opportunity to correct the errors, we will consider the merits, if any, of the points. *Empire Gas Corporation v. Small's LP Gas Company,* 637 S.W.2d 239, 245 (Mo.App.1982).

Appellant contends that this agreement was a so-called Mary Carter Agreement, popularized after the case of *Booth v. Mary Carter Paint Company,* 202 So.2d 8 (Fla.App.1967), and he argues that all such agreements should be held by Missouri courts to be contrary to public policy.

■ A Mary Carter Agreement is an agreement which limits the agreeing defendant's liability to a specified amount and guarantees the plaintiff that he will receive at least that amount. Such agreements also provide both that the agreeing defendant will remain in the case, without fully disclosing the agreement, and that if judgment for more than the specified amount is obtained against the nonsettling defendant, the money collected will be used first to offset the specified amount, so that the settling defendant may wind up paying nothing. *See,* Blending Mary Carter's Colors: A Tainted Covenant, 12 Gonzaga Law Review 266, 266–267 (1977).

Respondent contends that the agreement here was not a Mary Carter Agreement, but was rather a valid combination of a loan receipt agreement and the type of agreement authorized by section 537.065 RSMo 1978.

■ Respondent bases his argument that the agreement here was not a Mary Carter Agreement, on the fact that Oak Park's liability was not limited by the agreement, because the agreement did not limit the liability of Oak Park's insurer and did not place any limitation on respondent's right to proceed against the insurer. However, Oak Park's insurer was in liquidation at the time, and it is clear that neither respondent nor Oak Park believed that the

right to proceed against the insurer was very valuable. If Oak Park had expected its insurer to have the capacity to pay, it would have had no reason to enter into this agreement. Thus, in effect this agreement was a Mary Carter Agreement. However, it does not follow that the agreement was necessarily not a valid combination of a loan receipt agreement and an agreement of the type authorized by § 537.065.

■ A loan receipt agreement allows a person to advance money to a party with the proviso that it must be paid back only if the party obtains a judgment. Section 537.065 allows a defendant in a personal injury or wrongful death action to pay a plaintiff a specified amount in return for the plaintiff's agreement "that in the event of a judgment against the tort-feasor, neither he nor any person, firm or corporation claiming by or through him will levy execution" except as to specified assets or insurance contracts specifically set out in the agreement. Such an agreement is, like any other settlement agreement, not admissible for the purpose of showing that a settlement has been reached. However, like all settlement agreements, agreements of this type are admissible where necessary to show bias on the part of a witness. *See, Joice v. Missouri-Kansas-Texas Railroad Company*, 354 Mo. 439, 189 S.W.2d 568, 575 (1945).

Appellant has failed to cite this court to any Missouri authorities indicating that a combination of a loan receipt agreement and an agreement under § 537.065 is per se against a public policy of this state.

Contrary to appellant's contentions only two states have declared all Mary Carter Agreements to be against public policy. Nevada did so in *Lum v. Stinnett*, 87 Nev. 402, 488 P.2d 347 (1971) and Wisconsin did so in *Trampe v. Wisconsin Telephone Company*, 214 Wis. 210, 252 N.W. 675 (1934) (a case which preceded the popularization of this type of agreement).

Appellant contends that Oklahoma declared such agreements to be void as against public policy in *Cox v. Kelsey Hayes Company*, 594 P.2d 354 (Okla.1979), and that Vermont did so with *Vermont*

*Union School District No. 21 v. H.P. Cummings Construction Company*, 143 Vt. 416, 469 A.2d 742 (1983). However, neither case held that a Mary Carter Agreement could never be allowed. The *Cox* court rested its decision on the fact that there were no cross-claims and thus no need to determine percentages of fault, and no other issues directly involving the settling party. That was not the case here where both defendant's had filed cross-claims. In *Vermont Union School District*, the Vermont Supreme Court clearly stated that it was not finally resolving the issue, because in the case before it, the settling defendants were realigned prior to trial as plaintiffs. The court, however, indicated that given "a true Mary Carter agreement case," it would favor safeguards on a case-by-case basis, rather than a per se rule. *Vermont Union School District, supra* 469 A.2d at 749–750.

Most courts have gone this latter route. *See for example, Sequoia Manufacturing Company v. Hale Construction Company*, 117 Ariz. 11, 570 P.2d 782 (1977); *Pacific Indemnity, v. Thompson-Yaeger, Inc.*, 260 N.W.2d 548 (Minn.1977); *General Motors Corporation v. Simmons*, 558 S.W.2d 855 (Tex.1977); *Bedford School District v. Caron Construction Company*, 116 N.H. 800, 367 A.2d 1051 (1976); *Burkett v. Crulo Trucking Company*, 171 Ind. App. 166, 355 N.E.2d 253 (1976); *Gatto v. Walgreen Drug Company*, 61 Ill.2d 513, 337 N.E.2d 23, *cert denied*, 425 U.S. 936, 96 S.Ct. 1669, 48 L.Ed.2d 178 (1975) (holding, like the Oklahoma court in *Cox, supra*, that allowing the settling defendant to remain in the case is against public policy only if, as was not the case here, there are no cross-claims, and all issues involving the settling defendant are resolved by the agreement); and *Ward v. Ochoa*, 284 So.2d 385 (Fla.1973). These courts allow the agreements in circumstances and under conditions which are designed to prevent prejudice. The agreements can be edited in order to remove prejudicial phraseology and then allowed into evidence; or the agreements themselves can be excluded, and the courts can admit evidence of the

existence of such an agreement where that is necessary to prevent possible prejudice.

Of course, it is fundamentally unfair for the settling defendant to feign cooperation with the nonsettling defendant, while keeping the agreement secret. Once such an agreement has been entered into the settling defendant must not hide his position as an adversary party of the nonsettling defendant. However, there is no evidence properly before this court which indicates that Oak Park ever misled appellant. The record also reveals that appellant knew of the agreement prior to coming to trial.

Appellant has made a motion to supplement the record with material indicating that he and the representatives of Oak Park had agreed to share a common defense founded on lack of causation; a defense which appellant argues Oak Park abandoned at trial.

Nothing in the record indicates that the supplementary materials were before the trial court. It is axiomatic that this court cannot allow the record on appeal to be supplemented with information not before the lower court. *Horobec v. Mueller*, 628 S.W.2d 942, 944 (Mo.App.1982); *Carondelet Savings and Loan Association v. Boyer*, 595 S.W.2d 744, 746–747 (Mo.App.1980). Thus, appellant's motion must be denied, but we also note that the record does not indicate that Oak Park clearly abandoned that defense when it made its closing argument.

Also, the fact is that cross-claims had been filed, which means that both parties were in a sense pointing their fingers at each other long before trial. Therefore any claim by appellant that he was surprised or prejudiced is meritless.

There is a strong public policy against allowing secret agreements to work a fraud on either the nonsettling defendant(s), the jury, or the trial court. However, there are also strong public policy considerations in favor of allowing plaintiffs to control their own cases and settle with defendants as they choose. This court finds no reason that these policies cannot coexist, even in the presence of a Mary Carter Agreement, so long as the other defendant is not deceived.

■ In appellant's second point he contends, however, that here, he did not receive a fair trial. He argues first that his motion for severance made before trial began and renewed during the trial, should have been granted; but the issue of when to grant a severance is one which is left to the trial court's sound discretion. *See Wilson v. Bob Wood & Associates, Inc.*, 633 S.W.2d 738, 743 (Mo.App.1982); *B–W Acceptance Corporation v. Benack*, 423 S.W.2d 215, 217 (Mo.App.1967).

> Appellate courts will interfere with the trial court's exercise of discretion only when it has been manifestly abused; that discretion is abused only when the trial court's ruling runs against the logic of the circumstances then before the court and is so arbitrary and unreasonable as to show a lack of careful consideration and shock the sense of justice; if reasonable men can differ about the propriety of the action taken by the trial court, then the trial court did not abuse its discretion.

*Kasper v. Helfrich*, 421 S.W.2d 66, 69 (Mo.App.1967). *See also, Vonder Haar Concrete Company v. Edwards-Parker, Inc.*, 561 S.W.2d 134, 138 (Mo.App.1978). Here, appellant requested that the court "sever these out and try these two claims separately." He never clarified what he wanted severed, the two main claims of liability against each defendant or the claim and the cross-claim against him from the claim and cross-claim against Oak Park, or the cross-claims from the main claims. However, any type of severance would have created potential problems, because the amount of fault attributable to all the parties had to be determined and separate trials could have led to inconsistent verdicts on this issue. A jury had already been impaneled and appellant failed to offer any indication of precisely why denying the severance would be prejudicial. Under these circumstances, denying severance was not illogical and was certainly not so arbitrary and unreasonable as to show a lack of careful consideration. Thus, we find no abuse of the trial court's discretion.

■ Appellant next argues that the trial court erred in excluding the agreement

from evidence and in refusing to allow anyone who testified to be questioned about it. We find no error.

Appellant, himself, conceded that the agreement was not admissible in its entirety. The inadmissible portions included references to the amount of the payment and to insurance, as well as to a great deal of irrelevant information. Appellant never offered an edited version of the agreement. It is not the task of the trial court to prepare a party's exhibits for him. The agreement as offered was, by appellant's own admission, inadmissible. Appellant's counsel's request was that the whole agreement be admitted and that request was properly denied. At that point appellant could have offered an edited version. He did not do so and he therefore has no cause to complain that the agreement was not admitted. However, even if an edited version had been presented, it would only have been admissible for a specific articulable reason, other than for the impermissible purpose of showing that a settlement has been reached. The burden was on appellant to show such a specific purpose in relation to this case. Appellant's counsel presented no such specific purpose to support his request.

His only contention in this regard is that he should have been allowed to impeach plaintiff's witnesses with the agreement by showing bias. The only party to the agreement who testified was Carolyn Hackman, who signed the agreement on behalf of her mother. The only people connected to Oak Park who testified were former employees, who had no interest in the agreement. In fact, appellant never told the trial judge whose bias he wanted to demonstrate. Oak Park, itself, presented no witnesses.

Examination of Carolyn Hackman's testimony reveals that appellant could not have been prejudiced by his inability to cross-examine her because he essentially admitted all the facts to which Carolyn testified. Carolyn's testimony was that she had taken appellant's advice in choosing a home, that she had become concerned about her mother's care at Oak Park, and that she had written appellant about her concern and that he had promised to keep a close supervision on her mother. When she visited Oak Park, later and found her mother's foot covered by bloody sheets, she ordered that appellant be called. Later, her mother was admitted to a hospital and her leg was amputated. These facts were crucial to the jury's understanding of the plaintiff's case, but they were not disputed facts. Also, appellant never offered to cross-examine Carolyn about the agreement in order to show bias.

■ Under these circumstances, the trial court did not err in refusing to allow the use of the agreement itself or the fact of an agreement's existence, for purposes of cross-examination. Settlement agreements tend to be highly prejudicial and therefore they should be kept from the jury unless there is a clear and cogent reason behind admitting a particular agreement. There was no such reason here and the trial court thus acted correctly in following the general rule and excluding any evidence of the agreement which might have been prejudicial.

■ Appellant's final point on appeal, and the only one unrelated to the settlement agreement, concerns the admission of certain deposition testimony by plaintiff's surgeon which described the amputation procedure. Especially since plaintiff, because of her age and physical condition, was awake during the surgery, this testimony did in fact relate to her pain and suffering. Appellant contends that the testimony inflamed the jury against him, but he is unable to point to any indication of that in the record. The question of what evidence may inflame the jury is one that is generally left to the trial court which can see the jurors and note their reactions. *Fravel v. Burlington Northern Railroad,* 671 S.W.2d 339, 342–343 (Mo.App.1984) *cert. denied* 469 U.S. 1159, 105 S.Ct. 907, 83 L.Ed.2d 921 (1985).

The judgment is affirmed.

CRANDALL and KAROHL, JJ., concur.