**Mansel CARTER, Respondent,**

v.

**TOM'S TRUCK REPAIR, INC.,
et al., Appellants.**

No. 75128.

Supreme Court of Missouri,
En Banc.

June 29, 1993.

John H. Quinn, III, Thomas B. Weaver, St. Louis, for appellants.

Philip C. Denton, Dan H. Ball, William G. Guerri, Lawrence G. Dorroh, St. Louis, for respondent.

LIMBAUGH, Judge.

We granted transfer from the Court of Appeals, Eastern District, to consider important questions concerning the disclosure and validity of partial settlements executed in multiparty lawsuits, settlements known in the vernacular as "Mary Carter" agreements. We affirm the judgment of the trial court, entered in accordance with a jury verdict for $775,000 in favor of plaintiff, Mansel Carter.

On July 3, 1986, Mansel Carter, while stopped in his vehicle at a red light, was struck from behind by a Consolidated Freightways truck (Consolidated) driven by Johnny Bauer. At trial, Bauer testified that his brakes failed and that he was unable to stop. Prior to this accident, Tom's Truck Repair (Tom's) had repaired and maintained Consolidated's fleet of trucks, including the truck driven by Bauer.

Carter initially sued Consolidated and Bauer and later joined Tom's as a party defendant. Both Consolidated and Tom's filed cross-claims against each other for apportionment of fault, if any. During the trial, both Carter and Consolidated claimed that Tom's was negligent in inspecting, testing and repairing the truck brakes.

Several months before trial, on May 23, 1989, Carter and Consolidated entered into a "Mary Carter" settlement agreement in which Consolidated paid Carter $125,000 on execution of the agreement and guaranteed another $125,000 to be paid at final judgment. In return, Consolidated agreed to remain as a defendant and to not pursue an appeal of any judgment. Additionally, any judgment against Tom's Truck Repair or settlement paid in favor of Carter would reduce dollar for dollar Consolidated's settlement obligation. In essence, Consolidated's maximum total liability for plaintiff's damages as well as Tom's cross-claim was $250,000, and if judgment against Tom's exceeded $250,000, Consolidated would pay nothing. Carter also agreed that he would not settle with Tom's without the prior written consent of Consolidated and that he would not disclose the terms of the agreement absent a court order.

Under the usual course of discovery, Tom's was promptly notified of the existence of the agreement between Carter and Consolidated. Moreover, sixty days before trial, as ordered by the trial court, Tom's was given a copy of the agreement, although the amount was redacted. The settlement amount itself was disclosed to Tom's on the first day of trial, also by court order.

Because of Consolidated's status as a settling defendant and its questionable participation in the case, all parties, Tom's included, entered into a written stipulation, separate from the settlement agreement, in which they agreed, inter alia, that the jury would be required to assess the comparative fault of all parties.[1] The stipulation was contingent on the ability of Consolidated to fend off Tom's repeated motions to dismiss and to remain in the case as an active party.

The trial court disallowed any reference to the Mary Carter agreement during voir dire and opening statements. Thereafter, the court refused Tom's request to admit the agreement, even though the amount of the settlement was redacted. However, during the cross-examination of Consolidated's witnesses, the court read an "instruction" that advised the jury of the existence of the agreement and its basic terms, again with the amount of the settlement omitted.

In arriving at its verdict, the jury spared plaintiff of any blame and apportioned all fault equally between Consolidated and

---

1. The stipulation also required Carter and Tom's to dismiss their respective claims against Consolidated's driver, Mr. Johnny Bauer.

Tom's so that each defendant would be liable for $387,500, one-half of the damage award. Following entry of judgment, Tom's appealed, Consolidated did not. The appellate court reversed, holding that the settlement agreement was neither timely nor adequately disclosed to the jury. Although we, too, have serious concerns about the propriety of Mary Carter settlement agreements and the efficacy of the limited protections provided by the trial court, we affirm, finding no prejudice to the appellant.

Tom's raises the following issues, all related to the Mary Carter agreement:

1) whether Mary Carter agreements should be void as a matter of public policy;

2) whether the trial court erred in denying Tom's motion to dismiss Consolidated or to realign Consolidated as a party plaintiff;

3) whether the trial court erred in allocating one of defendants' peremptory strikes to Consolidated;

4) whether the trial court erred in a) granting Carter's and Consolidated's motion in limine preventing the disclosure to the jury of the terms of the Mary Carter agreement in voir dire and opening statement, and b) in refusing to permit Tom's to introduce the agreement in evidence; and

5) whether the trial court erred in denying Tom's request for a mistrial or to reopen the evidence after Consolidated discussed in closing argument its motivation for entering the settlement agreement.

## MARY CARTER AGREEMENTS AND PUBLIC POLICY

█ Mary Carter agreements occur in multiparty litigation when fewer than all defendants settle with the plaintiffs.[2] The term encompasses a wide variety of settlement arrangements that are "limited only by the ingenuity of counsel and the willingness of the parties to sign." *Maule Indus., Inc. v. Rountree*, 264 So.2d 445, 447 (Fla.App.1972), *modified*, 284 So.2d 389, 390 (Fla.1973).[3] A typical Mary Carter agreement has the following features:

1) The liability of the settling defendant is limited, and the plaintiff is guaranteed a minimum recovery;

2) The settling defendant remains a party to the pending action without disclosing the full agreement to the non-settling parties and/or the judge and jury, absent court order; and

3) If judgment against the non-settling defendant is for more than the amount of settlement, any money collected will first offset the settlement so that the settling defendant may ultimately pay nothing.

*See Hackman v. Dandamudi*, 733 S.W.2d 452, 455 (Mo.App.1986).

█ We first address Tom's concern that all Mary Carter agreements are contrary to public policy and invalid as a matter of law because they distort the adversary process and undermine the fair apportionment of damages under our system of comparative fault.

The propriety of Mary Carter agreements have been roundly criticized in recent years.[4] Courts and commentators have been particularly troubled by the secretive nature of the agreement and by the settling defendant's direct financial interest in the amount recovered against any non-settling defendant. We believe that these

---

**2.** The term is derived from *Booth v. Mary Carter Paint Co.*, 202 So.2d 8 (Fla.App.1967). In Arizona, these kind of agreements are known as "Gallagher Agreements" after *City of Tucson v. Gallagher*, 108 Ariz. 140, 493 P.2d 1197 (1972).

**3.** For other descriptions and definitions, *see Elbaor v. Smith*, 845 S.W.2d 240, 247–48 (Tex.1992); *Soria v. Sierra Pacific Airlines, Inc.*, 111 Idaho 594, 726 P.2d 706, 715–16 (1986); *Cox v. Kelsey-Hayes Co.*, 594 P.2d 354, 357 (Okla.1978); *General Motors Corp. v. Lahocki*, 286 Md. 714, 410 A.2d 1039, 1042–43 (1980).

**4.** *See e.g.*, John E. Benedict, Note, *It's a Mistake to Tolerate the Mary Carter Agreement*, 87 Colum.L.Rev. 368, 372–82 (1987); June F. Entman, *Mary Carter Agreements: An Assessment of Attempted Solutions*, 38 U.Fla.L.Rev. 521, 531–39 (1986); David R. Miller, Comment, Mary Carter Agreements: Unfair and Unnecessary, 32 S.W.L.J. 779, 785–92 (1978); *See also Elbaor v. Smith*, 845 S.W.2d 240, 247–250 (Tex.1992); *Vermont Union School v. H.P. Cummings Const.*, 143 Vt. 416, 469 A.2d 742, 749 (1983).

distinctive features do, indeed, distort the adversarial process and potentially undermine the right to a fair trial. As the Florida Supreme Court noted in *Ward v. Ochoa*, 284 So.2d 385, 387 (Fla.1973):

> [s]ecret agreements between plaintiffs and one or more of several multiple defendants can tend to mislead judges and juries, and border on collusion.
>
> \* \* \* \* \* \*
>
> By painting a gruesome testimonial picture of the other defendant's misconduct or, in some cases, by admissions against himself and the other defendants, he could diminish or eliminate his own liability by use of the secret "Mary Carter Agreement."

*Id.*

In the case at hand, the worst feature of a Mary Carter agreement—deception of the tribunal—is absent. Nonetheless, the traditional adversarial process was skewed to the extent that the jury was not informed of the agreement until well into trial.

Thus far only three states, Texas, Nevada, and Wisconsin, have declared Mary Carter agreements *per se* invalid: *Elbaor v. Smith*, 845 S.W.2d 240, 250 (Tex.1992); *Lum v. Stinnett*, 87 Nev. 402, 488 P.2d 347, 351 (1971); and *Trampe v. Wisconsin Telephone Co.*, 214 Wis. 210, 252 N.W. 675, 677–78 (1934). Although this Court has never addressed the propriety of these agreements, the Missouri court of appeals has approved their use on a case-by-case basis. *Hackman v. Dandamudi, supra.* Moreover, the vast majority of out-of-state jurisdictions have declined to condemn these agreements categorically. *See, e.g., Abbott Ford, Inc. v. Superior Court*, 43 Cal.3d 858, 239 Cal.Rptr. 626, 633, 741 P.2d 124, 131 (1987); *Vermont Union School v. H.P. Cummings Const.*, 143 Vt. 416, 469 A.2d 742, 749–50 (1983); *Shelton v. Firestone Tire and Rubber Co.*, 281 Ark. 100, 662 S.W.2d 473 (1983); *Sequoia Manufacturing Co. v. Halec Const. Co.*, 117 Ariz. 11, 570 P.2d 782, 793–95 (App.1977).

The unlimited variety of contractual arrangements that may be termed "Mary Carter" agreements cautions against prohibiting these agreements as a class. The content and effect of the settlement provisions and the factual background against which they are negotiated vary with each case. In some instances, the settlement agreement may be entered with a defendant who may be the most culpable of all the defendants or who may even be involved in collusive behavior. However, in other cases the agreement may be entered with a defendant who is only peripherally involved. An overly broad holding would void both. Furthermore, as noted in *Hackman*, competing public policy concerns are at work.

> There is a strong public policy against allowing secret agreements to work a fraud on either the nonsettling defendant(s), the jury, or the trial court. However, there are also strong public policy considerations in favor of allowing plaintiffs to control their own cases and settle with defendants as they choose. This court finds no reason that these policies cannot coexist, even in the presence of a Mary Carter Agreement, so long as the other defendant is not deceived.

*Hackman* at 457.

Like the court of appeals, we are convinced that the appropriate solution is to examine these troublesome agreements on a case-by-case basis rather than brand them all as outcasts.

## DISMISSAL AND REALIGNMENT

Tom's next alleges error in the trial court's refusal to either dismiss Consolidated from the case or realign the parties to make Consolidated a plaintiff. According to Tom's, the interests of plaintiff, Carter, and defendant, Consolidated, were identical. Both parties sought a jury verdict that would exceed $250,000 and that would maximize Tom's liability or percentage of fault. In the event of such a verdict, Carter would collect more than the $250,000 guaranteed by Consolidated, yet Consolidated would pay nothing. In this scenario, Tom's is correct that Consolidated's status as a party-defendant is illusory. That is not to say, however, that the virtually identical interests between Carter and Consoli-

dated necessitate formal realignment, much less Consolidated's dismissal.

 The need for a single jury to apportion fault among all potentially culpable parties and thereby promote judicial economy and preclude inconsistent verdicts is reason enough for Consolidated to remain in the case. Moreover, the fact that Consolidated's interests are different from Tom's does not necessarily justify formal realignment. Codefendants in any lawsuit who have filed cross-claims to apportion fault against each other are usually mutually antagonistic, whether or not one or the other is a party to a settlement agreement with plaintiff. Furthermore, a formal realignment in which Consolidated would be referred to as a plaintiff might promote, instead of alleviate, confusion about the parties' true interests. With such formal realignment, the jury would be asked to assess a percentage of fault against plaintiff Consolidated, which would have every appearance of a party-defendant but no similarity to a party-plaintiff.

We agree, however, that realignment can and should be achieved in some manner other than by denominating a defendant as a plaintiff. With this understanding, the trial court took several steps to prevent undue advantage in favor of Carter and Consolidated as a consequence of their settlement agreement. As will be discussed in the next section, the trial court, after voir dire, allocated two of the defendants' three peremptory strikes to Tom's and only one strike to Consolidated. Additionally, the trial court ruled in pretrial conference that Consolidated should be prohibited from any involvement at trial on the question of damages. Although plaintiff, in proving damages, introduced depositions of medical testimony that included questions asked by counsel for Consolidated, the fact that Consolidated's counsel participated in the questioning was not disclosed to the jury. Furthermore, in closing argument, the trial court curtailed Consolidated's participation by limiting its time for argument to twenty minutes even though the other parties were each granted forty minutes.

Most importantly, an informal "realignment" was achieved when the trial court read to the jury the instruction outlining all of the basic terms of the Mary Carter agreement and permitted both Tom's and Consolidated to discuss the agreement in closing arguments. In these ways, the jury was made aware of the parties' respective interests.

Under these circumstances, the trial court's refusal to dismiss Consolidated or to formally realign Consolidated as a party plaintiff was not error.

### PEREMPTORY STRIKES

One aspect of the requested realignment was a reallocation of peremptory strikes so that Tom's would have received not just two, but all three of the defendants' strikes. *Section 494.480.1, RSMo Supp. 1992,* states:

In trials of civil causes each party shall be entitled to peremptorily challenge three jurors. When there are multiple plaintiffs or defendants, all plaintiffs and all defendants shall join in their challenges as if there were one plaintiff and one defendant. The court in its discretion may allocate the allowable peremptory challenges among the parties plaintiff or defendant upon good cause shown and as the ends of justice require. In all cases, the plaintiff shall announce its challenges first.

 Because Consolidated's interests and Carter's interests with respect to both liability and damages were nearly identical and were totally antagonistic to Tom's, the trial court, in effect, gave plaintiff four strikes and gave Tom's, the only true defendant, only two. Although the allocation of peremptory strikes is discretionary, the "ends of justice" in this case required that the allocation be made according to the parties' true interests. Therefore, Tom's should have been awarded the defendants' full complement of three strikes.

 However, a judgment will not be reversed unless the error in awarding peremptory challenges to a litigant, or to multiple litigants having the same interest, is shown to be prejudicial. *See, e.g., Kidd v.*

*Chicago R.I. & P. Ry. Co.*, 310 Mo. 1, 274 S.W. 1079, 1094 (1925), *cert. denied*, 269 U.S. 582, 46 S.Ct. 119, 70 L.Ed. 424 (1925); *Wilson v. Bob Wood & Assoc., Inc.*, 633 S.W.2d 738, 744–45 (Mo.App.1981) (interpreting prior § 494.200, RSMo 1978). In order to prove the existence of prejudice, the complaining party must show that it exhausted its peremptory challenges and that a prospective juror, who the challenging party would have otherwise stricken, served on the jury. *See Effect of Allowing Excessive Number of Peremptory Challenges*, 95 A.L.R.2d 957, 963 (1970); *Bohna v. Hughes, Thorsness, Gantz, et al.*, 828 P.2d 745, 762–63 (Alaska 1992); *Thompson v. Presbyterian Hospital, Inc.*, 652 P.2d 260, 266–67 (Okla.1982); *Fick v. Wolfinger*, 293 Minn. 483, 198 N.W.2d 146, 149–50 (1972). From our review of the record in this case, Tom's did not disclose which prospective juror it would have struck had it been allocated three strikes instead of two. Nor is there any indication that Tom's would have challenged someone other than the person struck by Consolidated, or that it had any objection to any of the jurors who actually served. Moreover, there is no claim or suggestion from the record that any of the jurors selected was prejudiced to the extent that he or she should have been removed for cause.

In sum, absent a clear demonstration of prejudice, the trial court's error in failing to allocate all three defense strikes to Tom's does not justify reversal.

### DISCLOSURE TO JURY

In its next point of error, Tom's propounds two issues, both relating to disclosure of the settlement agreement to the jury. First, Tom's argues that the trial court erred in granting Consolidated's motion in limine, which prevented disclosure to the jury of the terms of the Mary Carter agreement during voir dire and opening statement. Second, Tom's contends that the trial court erred in failing to admit into evidence the actual settlement agreement, offered in redacted form. In support of these points, Tom's states that disclosure, "would have revealed to the jury the true alignment and interest of the parties, the

bias and prejudice of the witnesses and the reasons behind plaintiff's and Consolidated's conduct during trial with regard to liability and damages."

■ We agree with Tom's that the surest cure for the ill effects of a Mary Carter agreement is disclosure of its terms to the court and to the jury. *See Ratterree v. Bartlett*, 238 Kan. 11, 707 P.2d 1063, 1074 (1985). The court should, upon motion of a party adversely affected by the settlement agreement, disclose the existence of and the basic terms of the agreement *unless* the court finds that disclosure will create substantial danger of undue prejudice or confusion. *Id.* 707 P.2d at 1074–76. However, the extent of that disclosure should ordinarily be limited. Mary Carter agreements most often contain information that is impermissibly prejudicial, such as amounts of settlement and provisions referring to insurance coverage. There is little disagreement that this kind of information should be eliminated. Moreover, in making disclosure, it is appropriate and probably necessary that the jury be told either by a stipulation or by trial court instruction that the agreement has no bearing on the issue of the parties' respective liability. With these points in mind, we turn to the specific issues raised by Tom's.

■ During the pretrial conference on the first day of trial, the court sustained Consolidated's oral motion in limine in which it requested "that through voir dire and opening statement that [Tom's counsel] not make any reference to the fact that there has been an agreement entered into between Consolidated and plaintiff." Although the motion was sustained, the trial court indicated that the agreement would be admissible at least for the impeachment of Consolidated's witnesses and to establish bias and prejudice on the part of those witnesses.

In the opening statements, plaintiff's counsel made the following remarks:

I have no grudge against Mr. Bauer at Consolidated Freightways. If you believe the brakes were going out, if you don't believe the brakes were going out,

it is all Mr. Bauer's fault. I don't personally believe that. It's for you to determine what the evidence will show and make up your own minds. It's either/or. Brakes were going out, Tom's Truck Repair's fault or Mr. Bauer's fault, which I don't believe it was Mr. Bauer's fault.

\* \* \* \* \* \*

In any event, I'll be asking for a verdict on behalf of Mansel Carter in this case in the amount of money that's fair and reasonable that you ought to decide against Tom's Truck, Inc. I think the verdict should be against them for one hundred percent. The alternative is if you feel there wasn't a brake problem here, and it's all Consolidated Freightways problem for a truck driver rear ending a car, and that's not suppose to happen, obviously. In normal circumstances you fail to keep a careful lookout and you are negligent. You hit somebody who was stopped. I don't think that's what happened here. I have no quarrel with Mr. Bauer. I don't personally believe Mr. Bauer did anything wrong. I think the negligence is on Tom's Truck, Inc.

Soon thereafter, Consolidated's counsel, in his opening statement, told the jury that Tom's had not "owned up" and accepted responsibility for the accident nor "come forward" to do the "right thing." In view of these remarks by Carter and Consolidated, Tom's counsel suggested to the court that the "door had been opened" for him to mention the Mary Carter agreement in his own opening statement. The trial court, however, denied the request.

The obvious lack of vigor on the part of Consolidated and the plaintiff's insistence that Tom's was totally at fault are the direct consequences of the realigned loyalties and distorted adversarial relationship produced by the Mary Carter agreement. It is apparent that Tom's was disadvantaged by the court's ruling. Although trial courts are given considerable leeway in controlling opening statements, we hold

that it was an abuse of discretion to disallow disclosure of the settlement agreement in Tom's opening statement.[5]

Despite the trial court's error, any prejudice to Tom's was insufficient to mandate reversal. The jury was eventually apprised of the material terms of the settlement agreement. Also, the effect of the agreement to either realign or misalign the parties was made perfectly clear during closing arguments. That lack of prejudice is also demonstrated by the fact that the jury obviously rejected Carter's and Consolidated's claim that Tom's was solely at fault.

■ Tom's second complaint—that the trial court failed to admit into evidence a redacted version of the agreement—is more easily resolved. Given the great risk that one party or another will be prejudiced by either the disclosure or the nondisclosure of the agreement, we believe that the means and method for that disclosure should be left to the trial court's sound discretion. As stated by the court of appeals in *Hackman:* "The agreements can be edited in order to remove prejudicial phraseology and then allowed into evidence; or the agreements themselves can be excluded, and the courts can admit evidence of the existence of such an agreement where that is necessary to prevent possible prejudice." *Hackman* at 733 S.W.2d 456–457.

■ Instead of allowing the admission of the settlement agreement, itself, the court read a limiting instruction to the jury which acknowledged the existence of the agreement, noted that plaintiff was guaranteed a sum certain, and indicated that Consolidated's settlement was repayable in whole or in part out of any recovery Carter might obtain from Tom's. Although the "instruction" was more in the nature of a stipulation of facts or an acknowledgment of those facts by judicial notice, the jury could not have been mistaken that it was to consider the information as evidence. Moreover, the redacted version offered by

---

5. Neither in the briefs nor in the transcript is there any indication that Tom's sought during voir dire to ask questions about the Mary Carter agreement. To the extent the disclosure issue pertains to voir dire, it has been abandoned.

Tom's but refused by the court contained no more information than that disclosed to the jury in the court's instruction. In this instance, there was no abuse of discretion.

### CLOSING ARGUMENT

██ Finally, we address Tom's contention that the trial court erred in failing to declare a mistrial or reopen the evidence following Consolidated's allegedly improper remarks during closing argument.

Specifically, Tom's complains that Consolidated, without any factual support in the record, and in violation of the motion in limine, expounded on its motivation for entering into the settlement agreement with Carter. Consolidated, after reminding the jurors of the existence of the settlement agreement, stated: "We decided to resolve our differences with Mr. Carter and devote full attention to Tom's Truck Repair. They are the people at fault here." Tom's then objected and moved for a mistrial for the stated reason that Consolidated was being allowed to discuss the settlement agreement even though Tom's had been prevented from introducing the agreement into evidence. In overruling the objection, the court noted that Tom's would have an opportunity to respond.

It is well settled that counsel should be afforded wide latitude during closing argument to suggest inferences from the evidence. *Moore v. Missouri Pacific Ry. Co.,* 825 S.W.2d 839, 844 (Mo. banc 1992). As indicated earlier, evidence of the existence and basic terms of the settlement agreement was provided to the jury by way of the court's limiting instruction. The trial court clearly paved the way for the parties to use the fact of the settlement agreement not only as a tool in the examination or cross-examination of the witnesses, but also as a point of discussion in closing argument. Consolidated's stated motivation for entering the settlement agreement may arguably be inferred from the provisions of the agreement. This argument was nothing more than a variation on Consolidated's theme of placing the blame on Tom's. As noted, there is nothing unusual about this tactic whenever fault is to be apportioned among codefendants. Moreover, taken in context, Consolidated's mention of the settlement agreement was merely in anticipation of Tom's own closing argument. Tom's was, indeed, given the opportunity to fully discuss the ramifications of the settlement agreement and from our perusal of the record, the settlement agreement was a primary focus of Tom's closing argument. There was no error.

### CONCLUSION

In all respects, the judgment of the trial court is affirmed.

ROBERTSON, C.J., and COVINGTON, HOLSTEIN, BENTON and PRICE, JJ., concur.

THOMAS, J., concurs in part and concurs in result in separate opinion filed.

THOMAS, Judge, concurring in part and concurring in result.

I concur in all respects with the majority opinion except with regard to the portion of the opinion dealing with peremptory strikes, and as to that I concur in the result.

Section 494.480.1, RSMo Supp.1992, provides initially that where there are multiple parties all plaintiffs and defendants shall share their respective peremptory challenges. However, the statute provides further that the trial court has discretion to allocate peremptory challenges on some other basis upon good cause shown and as the ends of justice require. In this instance, the trial court followed the direction of the statute by requiring Tom's, who was in name a defendant, to share the three peremptory challenges allocated to the defendants with co-defendant Consolidated. However, I agree with the majority opinion that Consolidated's and Carter's interests, especially with reference to damages, were nearly identical and were totally antagonistic to Tom's so that the method which the trial court followed in allocating peremptory challenges in effect gave plaintiff four strikes and gave Tom's, the only true defendant, only two. Since the allocation used by the trial court was in accord

with the primary direction of the statute, I do not find it to have been an abuse of discretion to have allocated peremptory challenges in this manner. However, I believe it would have been preferable to have required Consolidated and Carter to share the plaintiff's peremptory challenge and to have given Tom's, who stood alone on the other side of the lawsuit, the three peremptories provided for the defendants.

On the other hand, I disagree with the view of the majority that Tom's failed to preserve its objection to the trial court's method of allocating peremptory challenges because Tom's failed to demonstrate that the trial court's method of allocating peremptory challenges was prejudicial. The majority would require that the complaining party show "that it exhausted its peremptory challenges and that a prospective juror, who the challenging party would have otherwise stricken, served on the jury." Maj. op. at 177. It is my view that, under the Missouri system of selecting jurors, if there is such a requirement it is self-enforcing and is an illusory requirement at best. The initial requirement that the complaining party "exhaust his peremptory challenges" suggests that a party has an option to either exercise or waive his peremptory. In Missouri in a civil case after the challenges for cause have been completed and ruled on there are eighteen jurors "in play" for the twelve juror positions.[1] The plaintiffs exercise their three peremptory challenges first followed by the exercise of the three peremptories by the defendants. Section 494.480.1, RSMo Supp.1992. The exercise of the six peremptory challenges reduces a jury from eighteen to twelve, the required number. There is no option to waive the peremptory; in this respect, Missouri's system is unlike many other states where there are twelve jurors on the potential jury at the beginning of the exercise of the strikes and as each party exercises the strike a new name

is drawn from the remaining panel and placed on the jury. Under this system it is common to waive strikes because there is always the potential that, if you exercise your peremptory challenge, the replacement juror will be worse for you than the juror struck.

The majority would further require the complaining party show that the prospective juror who the challenging party would have otherwise stricken, served on the jury. This requirement is also self-enforcing, clearly so with a defendant such as Tom's, because the defendant exercises its peremptories after plaintiffs. If the trial court had allocated the plaintiff's three strikes to Carter and Consolidated and the remaining three to Tom's, Carter and Consolidated would have been required to exercise their three strikes before Tom's exercised any of his. When Tom's received the jury list, after Carter and Consolidated had exercised their strikes, there would have been fifteen potential jurors left on the list, and when Tom's exercised its three strikes (which would include the strike which was actually awarded to Consolidated), it would obviously be exercising those strikes against three people who would otherwise serve on the jury. The position of the majority that Tom's did not properly preserve its objection to the method of allocating peremptory challenges is totally illusory. The majority opinion is not only applying an unfair test to Tom's objection to the allocation of peremptory challenges, but it also creates a requirement for future cases that will be both elusive and illusory.

I concur in all other respects in the majority opinion.

---

1. In most Missouri courts, the eighteen lowest numbered jurors remaining on the panel after jurors have been excused and the challenges for cause have been ruled will constitute the potential jurors subject to the parties exercising their six peremptory challenges. If the trial judge has some other method of selecting the eighteen jurors who are "in play", the lawyers will be advised of this method and will know which eighteen jurors are under consideration subject to the exercise of the six peremptory challenges.