Joanne O'NEAL, Appellant,

v.

PIPES ENTERPRISES,
INC., Respondent.

No. WD 50128.

Missouri Court of Appeals,
Western District.

Dec. 5, 1995.

Motion for Rehearing and/or Transfer to
Supreme Court Denied Jan. 30, 1996.

Application for Transfer Sustained
March 26, 1996.

Case Retransferred Oct. 22, 1996.

Court of Appeals Opinion Readopted
Oct. 31, 1996.

Brian T. Meyers, Martin M. Meyers, The Meyers Law Firm, Kansas City, for appellant.

Paul D. Cowing, Margaret A. Gallagher, Andrew S. Mandelson, Sinclair, Sawyer, Thompson, Haynes & Cowing, P.C., Kansas City, for respondent.

Before LAURA DENVIR STITH, P.J., and LOWENSTEIN and HANNA, JJ.

LAURA DENVIR STITH, Presiding Judge.

Shortly before midnight on June 26, 1992, a truck owned by Defendant Pipes Enterprises, Inc. (Pipes) jackknifed while travelling uphill on dry pavement. The truck tractor and nearly all of the trailer it was pulling came to rest in the center median, but approximately six feet of the trailer extended into the passing lane of the interstate highway. In addition, because the truck's batteries had flown out of the truck during the jackknife, the truck and trailer were both unlit. Pamela O'Neal, travelling west on Interstate 70 toward Kansas City in her Nissan pick-up truck, struck the six-foot portion of the trailer extending onto the highway and was killed.

Pamela's mother, Joanne O'Neal, brought an action for wrongful death against Pipes pursuant to section 537.080, RSMo Cum. Supp.1992. The jury awarded damages of $100,000. It assessed only 45% of the fault to Pipes and 55% to Plaintiff's decedent Pamela, resulting in a judgment of $45,000 for Plaintiff against Pipes. Plaintiff appeals this judgment on the basis of evidentiary and instructional errors by the trial judge. We reverse and remand for a new trial.

## I. *FACTUAL AND PROCEDURAL BACKGROUND*

### A. *Accident.*

At trial, two different versions of the accident were presented by two different witnesses, neither of whom were themselves involved in the accident. The testimony of Robert Hammett, a Yellow Freight Company truck driver, who witnessed the accident, was presented by videotape. Mr. Hammett testified that, after he saw the Pipes driver's truck jackknife, he pulled off on the right-hand shoulder approximately 100 feet from

where the jackknifed truck came to rest. From where he was standing, Mr. Hammett could see the jackknifed trailer sticking out into the traveled portion of the road. He could also see the reflectors on the trailer, as well as a break in the yellow line painted along the left-hand side of the road, at the point where the jackknifed truck had come to rest.

Mr. Hammett stated that he got out of his Yellow Freight truck and stood in the right lane with a flashlight, trying to warn oncoming drivers of the location of the jackknifed truck. He had parked his truck in such a way that the headlights were aimed at the jackknifed truck. He stated that the jackknifed truck had "good reflectors on it" and he felt that these would help the oncoming drivers see the trailer sticking out onto the highway.

The first group of vehicles to pass Mr. Hammett included at least three vehicles, all of which he testified were in the left-hand passing lane. He estimated that these vehicles were traveling at least 70 miles per hour and that none slowed as they approached him. The first vehicle, a Ford Aerostar-type van, honked as it passed him but continued through, missing the jackknifed trailer. He testified that the O'Neal vehicle was approximately one and one-half car lengths behind the Ford van. The third vehicle was one and one-half to two car lengths behind the O'Neal vehicle.

As the O'Neal vehicle passed Mr. Hammett, he saw its brake lights come on and then go off. He turned back to check for oncoming traffic, thinking the O'Neal vehicle had safely passed the jackknifed trailer, and then heard the crash. The third vehicle stopped and pulled over in front of his truck on the right-hand shoulder.

The testimony of Deborah Young, the only other witness to testify regarding the accident, was quite different from that of Mr. Hammett. She testified that the O'Neal vehicle was traveling in the right-hand lane (rather than in the left-hand lane as stated by Mr. Hammett) and that she was traveling three or four feet directly *behind* the O'Neal vehicle (rather than in front of it as stated by Mr. Hammett) in an Aerostar van. She tes-

tified that both vehicles were traveling at 65 to 70 miles per hour.

Ms. Young testified that a van with a home-made trailer traveling in the left-hand lane abruptly changed to the right-hand lane without signalling. She surmised that this occurred at a point when that vehicle was close enough to the jackknifed trailer to see that it was sticking out into the left lane. The O'Neal vehicle was forced to move to the left-hand lane to avoid hitting the van with the home-made trailer which had suddenly merged in front of it. Approximately 15 to 20 seconds later, the O'Neal vehicle hit the jackknifed trailer. Ms. Young, who was still in the right-hand lane, then stopped her car and pulled off on the right-hand shoulder.

Ms. Young stated that she had not seen the jackknifed trailer sticking out into the road before the accident. Ms. Young also testified that a little blue car was able to avoid the O'Neal vehicle after it had hit the jackknifed trailer.

### B. *Settlement Agreement.*

Upon receiving notice in early June, 1994 that the trial of this action was set for June 20, 1994, Pamela's father, James O'Neal, secured local counsel in Kansas City. The morning that the trial was scheduled to begin, Mr. O'Neal appeared with local counsel before the court, seeking to intervene. A hearing was immediately held and the trial judge indicated he would sustain Mr. O'Neal's motion to intervene. Mr. O'Neal's local counsel then approached defense counsel and indicated that Mr. O'Neal would accept, on behalf of the entire class of survivors of Pamela O'Neal, a settlement offer, previously rejected by Plaintiff Joanne O'Neal. Acceptance of the settlement offer would have derailed the trial setting and resulted in a hearing to approve the settlement agreed to by Mr. O'Neal on behalf of all survivors of Pamela O'Neal and Defendant.

Defense counsel then told counsel for Plaintiff of Mr. O'Neal's purported acceptance of Defendant's settlement offer. Concerned about these events and their potential effect on the lawsuit, counsel for Plaintiff advised Plaintiff that she should enter into a

settlement agreement with Mr. O'Neal in order to ensure that he would not interfere with the trial of the matter. Plaintiff did so, reaching an agreement with Mr. O'Neal that he would receive one-third of any award up to a maximum amount of $125,000. Mr. O'Neal then left the court and made no further appearances during trial. His intervention was never formally approved.

### C. *Evidence of Relationship of Pamela O'Neal with Her Father and of the Settlement Agreement.*

Cheryl Watts, a close friend of Pamela's, was asked by counsel for Pipes about Pamela's relationship with her father. The trial court allowed a limited amount of this testimony over Plaintiff's objection that it was irrelevant, but ruled that defense counsel could not address the issue of damages in regard to Mr. O'Neal since no damages were requested on his behalf. Ms. Watts testified that Pamela had no or, at best, a poor relationship with her father, James O'Neal. Ms. Watts further testified that she was aware of only two occasions on which Pamela had attempted to contact her father.

Plaintiff later testified on direct examination that Pamela "hated her father" and "had no use for the man." Pamela's father had no contact with her after leaving the family in 1971 except on one occasion when Pamela moved out of her mother's home after she and her mother had a disagreement. At that time, Pamela's father physically removed Pamela to his home in Georgia where she remained for three days. She left her father's home after they "got into a conflicting attitude, and he made some bad moves on her."

On cross-examination, defense counsel asked Plaintiff if Pamela's father had been present at court on the Monday morning before trial. Counsel for Plaintiff objected that questions regarding the father's presence were irrelevant because the father was not making a claim for damages. The trial judge stated that he had been prepared to exclude this evidence, but that Plaintiff's direct testimony had included statements regarding the relationship of Pamela and her father. Even so, the trial judge initially indicated he would sustain the objection as to questions regarding the settlement agreement.

However, Defendant's counsel argued that the settlement agreement impeached Plaintiff's credibility in that "she paid him to go away because she did not want him to testify about what her relationship was with Pamela." Defense counsel claimed that they were "entitled to impeach her credibility with respect to what she was concerned about him saying about her relationship with Pamela." Defense counsel also asserted that the settlement agreement was evidence of bias.

The trial court ultimately agreed to allow questions regarding the nature of the agreement with Pamela's father because such information was relevant "to any loss sustained by the survivors rather than just limited to any damage by the plaintiff Joanne."

Defense counsel went on to repeatedly question Plaintiff as to whether she had agreed to pay Pamela's father a certain percentage of any verdict or settlement in this case up to a certain amount. Plaintiff testified that she had not made any agreement with him. She further testified that she did not know what agreement was made but she "just didn't want him here." She denied that the reason for this was that she did not want him in front of the jury or that she did not want him to testify. Rather, she stated that, even though he was Pamela's natural father, he had not attended the memorial services and had "done nothing through all of this." Plaintiff claimed the attorney-client privilege in regard to any terms of the settlement agreement. Plaintiff moved for a mistrial based on the introduction of this evidence at trial, but the motion was overruled.

### D. *Instructions.*

At the instruction conference, Plaintiff objected to Instruction No. 8 on the grounds that there was no support in the evidence for submission of negligence on the part of Pamela O'Neal. Instruction No. 8, addressing the negligence of Pamela O'Neal stated as follows:

In your verdict you must assess a percentage of fault to Pamela O'Neal if you believe:

First, Plaintiff Joanne O'Neal was the mother of Pamela O'Neal, and

Second, either:

Pamela O'Neal was following the vehicle in front of her too closely, or drove at an excessive speed, or knew or by the use of the highest degree of care could have known that there was a reasonable likelihood of collision in time thereafter to have swerved, and

Third, Pamela O'Neal, in any one or more of the respects submitted in paragraph Second, was thereby negligent, and

Fourth, such negligence either directly caused or directly contributed to cause the death of Pamela O'Neal.

Plaintiff specifically objected that "there is no evidence of causation as to any of these factors. There is no evidence as to negligence as to any of these factors." The trial court overruled Plaintiff's objection and submitted Instruction No. 8 as originally tendered.

In addition, Plaintiff objected to Instruction No. 9 which, in relevant part, states:

If you assess a percentage of fault to defendant, then, disregarding any fault on the part of Pamela O'Neal, you must award plaintiff such sum as you believe will fairly and justly compensate the survivors of Pamela O'Neal for any damages you believe they sustained as a direct result of the fatal injury to Pamela O'Neal.

Counsel for Plaintiff stated that he "tendered an instruction that is essentially in the form of MAI 5[.]01 and 37[.]03 that uses the term plaintiff instead of the term survivors of Pamela O'Neal as the people whose damages they are assessing." He had submitted the instruction with this change because he thought it was "error to submit the claims and damages for people where the evidence does not support it, and there's no evidence here supporting a claim of any survivor of Pamela O'Neal beyond the plaintiff." Nevertheless, the instruction submitted to the jury retained the language of "survivors of Pamela O'Neal."

### E. Jury Viewing Videotaped Testimony During Deliberations.

During deliberations, the jury asked to see the "Yellow Freight testimony in its entirety." The trial judge interpreted this as referring to Plaintiff's Exhibit 22, the videotape deposition of Mr. Hammett, the driver for Yellow Freight. In response to the judge's suggestion that his clerk show this exhibit to the jury in the jury room, Plaintiff objected as follows:

Plaintiff objects because it's contrary to Missouri law to have the testimony of one witness in the jury room and emphasize one witness's testimony above all others. That's akin to allowing the jurors to read a deposition, similarly it would be like a camera was in the courtroom and you taped the live presentation of the plaintiff's testimony and they asked to view that. I think it's improper because it emphasizes one person's testimony above everybody else's.

Defendant believed the deposition should be treated similarly to a photograph introduced as an exhibit and that the jury should be able to view it. The trial court overruled Plaintiff's objection and the deposition was replayed in its entirety to the jury.

### II. THE COURT PREJUDICIALLY ERRED IN REPLAYING VIDEOTAPED DEPOSITION TESTIMONY FOR THE JURY DURING ITS DELIBERATIONS

Plaintiff alleges that the trial court erred in permitting the jury to view the videotape testimony of Mr. Hammett during deliberations, arguing that Missouri law prohibits the repetition of any portion of the testimony to the jury after the trial has ended unless both parties consent. Pipes contends that the videotape was an exhibit and, as such, the jury was properly permitted to view the testimony of Mr. Hammett, citing a number of cases which permit the jury to view properly admitted exhibits. Furthermore, Pipes argues that, in any event, it believes jurors should be permitted access to testimony during deliberations.

We disagree. It is the long-standing rule in Missouri that trial testimony may not be reread to the jury without the consent of both parties. *State v. Gomez,* 625 S.W.2d 891, 892 (Mo.App.1981); *Small v. Wegner,* 267 S.W.2d 26, 29 (Mo.1954); *State v. Dowe,* 432 S.W.2d 272, 276 (Mo.1968); *Isreal v. Fanchon & Marco,* 58 S.W.2d 774, 778 (Mo. App.1933) (all holding that it is improper to permit the court reporter to read his or her notes or transcript to the jury without the consent of both parties). The rationale for this rule is set out in *Isreal v. Fanchon & Marco,* 58 S.W.2d at 778. *Isreal* noted the courts' concern that repetition of a portion of trial testimony would cause that portion to be emphasized by reiteration, which in turn "might lead to interminable confusion or to an unwarranted advantage to one party over the other," and which further would invade a juror's duty to solely determine the facts according to his or her memory alone. *Id.*

Although Missouri thus prohibits the jury from rehearing portions of the evidence during deliberations, it does permit non-testimonial exhibits such as documents or photographs to be sent to the jury room at the discretion of the trial judge. *See, e.g., Freeman v. Kansas City Power & Light Co.,* 502 S.W.2d 277, 282 (Mo.1973) ("[O]nce a court has determined that an item of evidence is admissible in a case, that evidence should be made available to the jury on an equal basis with all other evidence in the case."); *Cox v. Blackwell,* 661 S.W.2d 831, 833 (Mo.App. 1983) (same).

The issue thus becomes whether testimonial exhibits such as the deposition or videotape in question here should be treated like trial testimony and excluded from the jury room or should be treated like non-testimonial exhibits and be permitted to be viewed by the jury during deliberations. It appears that Missouri has not had occasion to address this narrow issue in a *civil* case.[1] In criminal cases, however, Missouri courts have repeatedly held that exhibits that are testimonial in nature *cannot* be given to the jury during its deliberations. *State v. Evans,*

639 S.W.2d 792, 795 (Mo. banc 1982). The rationale for this rule is simple: a deposition is introduced at trial in place of the live testimony of the same witness. It is thus considered to be testimonial in nature and so, like a transcript of live testimony, is not given to the jury during deliberations. *State v. Brooks,* 675 S.W.2d 53, 57 (Mo.App.1984). As the use of videotaped depositions "provides as close an approximation to the actual presence of the witness in court as can be done," *State ex rel. Lucas v. Moss,* 498 S.W.2d 289, 292 (Mo.1973), it is even more like the testimony of live witnesses than is a written deposition transcript.

We see no reason why the rationale for exclusion of depositions from the jury room in criminal cases is not equally applicable in civil cases. Pipes cites us to no Missouri case or policy to the contrary. Indeed, the sole case cited by Pipes in support of its argument that the videotape was properly shown to the jury, despite the fact it consisted of testimony of a witness, is the non-Missouri case of *Houston Lighting & Power Co. v. Klein Indep. Sch. Dist.,* 739 S.W.2d 508, 519 (Tex.App.1987). According to Pipes, in *Houston Lighting & Power,* the trial court was required to send to the jury eight large index cards filled out during the trial and containing the testimony of one of defendant's witnesses, "the same as any other exhibits." Pipes suggests that these cards were clearly testimonial in nature, that if Texas would permit them to go to the jury room, it would probably also permit depositions introduced at trial to go to the jury room, and that we should do so also.

First, we note that, even if such were the rule in Texas, it is *not* the rule in Missouri, and is contrary to the public policy reasons noted above which support exclusion of such evidence from the jury room. In any event, and as pointed out by Plaintiff, Pipes' conclusion as to how Texas would treat depositions is not accurate. The index cards were sent to the jury in *Houston Lighting & Power* because Texas rules specifically require written exhibits go to the jury room. The same

1. In *State v. Naucke,* 829 S.W.2d 445, 459–60 (Mo. banc), *cert. denied,* 506 U.S. 960, 113 S.Ct. 427, 121 L.Ed.2d 348 (1992), the court refused to

rule on this very issue because neither party had objected to replaying the videotaped deposition testimony to the jury.

rules specifically exempt depositions from this requirement, however. Thus, even in Texas, depositions apparently would be treated like live testimony and transcripts of them would not be sent to the jury room.

■ For these reasons, we hold that the trial court erred in sending the Yellow Freight driver's videotape deposition to the jury room. That testimony was crucial to the issue of the comparative fault of Pamela O'Neal, for the driver's testimony indicated she might have avoided the accident. The testimony of the other witness, Ms. Young, might have led to the opposite conclusion. In light of the jury's apportionment of 55% of the fault to Pamela, we find that the error was prejudicial, in that it may well have affected the jury's verdict. We, therefore, reverse and remand for a new trial.

## III. OTHER EVIDENTIARY MATTERS WHICH MAY RECUR

Three of the other issues raised on appeal involve evidentiary matters which may arise again on remand. We therefore exercise our discretion to address them here for the guidance of the parties and court below.

### A. Use of the Phrase "Survivors of Pamela O'Neal" in the Damage Instruction.

■ Plaintiff claims that the use of the phrase, "the survivors of Pamela O'Neal," rather than the term, "plaintiff," in the damage instruction constituted error because no evidence was presented of damages suffered by Pamela's father or by any party other than Plaintiff. On these facts, Plaintiff argues, the use of the phrase "the survivors of Pamela O'Neal" served only to accentuate the fact that Pamela's father would receive some of any money awarded. Plaintiff believes this encouraged the jury to award less damages so that Mr. O'Neal would receive a smaller amount under the settlement agreement.

The damage instruction, Instruction No. 9, was patterned after MAI No. 5.01, the approved instruction for use in submitting damages in a wrongful death action. The Notes on Use to MAI No. 5.01 state:

In the case where not all beneficiaries are joined as plaintiffs in the claim for wrongful death or the plaintiff is a plaintiff ad litem, substitute for the word "plaintiff[s]" the phrase "the survivor[s] of *(insert name of decedent)* ".

Thus, the Notes on Use specifically mandate the use of the "survivors" language in this case. The Notes are undoubtedly based on the following statutory language:

if two or more persons are entitled to sue for and recover damages as herein allowed, then any one or more of them may compromise or settle the claim for damages with approval of any circuit court, or may maintain such suit and recover such damages without joinder therein by any other person, provided that the claimant or petitioner shall satisfy the court that he has diligently attempted to notify all parties having a cause of action under section 537.080. *Any settlement or recovery by suit shall be for the use and benefit of those who sue or join, or who are entitled to sue or join, and of whom the court has actual written notice.*

§ 537.095.1, RSMo 1986 (emphasis added).

Mr. O'Neal, although not a party to the suit, was a party entitled to sue or join. The trial court had actual notice of him through his motion to intervene. As such, there was more than one survivor of Pamela O'Neal and the use of the phrase, "survivors of Pamela O'Neal," in the instruction was required.

Of course, that does not mean that Pamela O'Neal's father was entitled to or would receive any of the damages awarded by the jury. To the contrary, a wrongful death claim for damages is divided into two stages. *Teeter v. Missouri Highway & Transp. Comm'n*, 891 S.W.2d 817, 820 (Mo. banc 1995). In the *first* stage, the total damages for "those who sue or join, or who are entitled to sue or join" are determined *by the jury* as the trier of fact. The jury's role then ends. In the *second* stage, "[t]he court shall then enter a judgment as to such damages, apportioning them among those persons entitled thereto in proportion to the losses suffered by each as determined by the court." § 537.095.3, RSMo 1986.

Here, if the court found that Pamela's father had not suffered any losses, then, at least in the absence of the settlement, it was free not to apportion any of the damages awarded by the jury to him. However, this was a matter for the court. It was the jury's job to award the total damages due all survivors of Pamela O'Neal, and the jury instruction properly so stated.

### B. *Introduction of Evidence of Settlement was Error.*

■ Plaintiff also argues that the trial court erred in admitting evidence of Plaintiff's settlement agreement with Pamela's father, under which he was to receive a percentage of the damages awarded up to a maximum of $125,000. The basic rule, in Missouri and elsewhere, is that evidence of settlement agreements is not admissible. *Asbridge v. General Motors Corp.*, 797 S.W.2d 775, 781 (Mo.App.1990). This is because settlement agreements tend to be highly prejudicial and, thus, should be kept from the jury unless a clear and cogent reason exists for admitting a particular settlement agreement. *Id.*

Missouri has adopted a commonly recognized exception to this rule in the case of "Mary Carter agreements." Our Supreme Court has held that the term Mary Carter agreements "encompasses a wide variety of settlement arrangements that are 'limited only by the ingenuity of counsel and the willingness of the parties to sign.'" *Carter v. Tom's Truck Repair, Inc.*, 857 S.W.2d 172, 175 (Mo. banc 1993).

What Mary Carter agreements all seem to have in common, however, is that they "occur in multiparty litigation when fewer than all defendants settle with the plaintiffs." *Id.* It is this very feature of Mary Carter agreements which troubles courts and commentators, for the agreements give the settling defendant a "direct financial interest in the amount recovered against any non-settling defendant" and so "distort the adversarial process and potentially undermine the right to a fair trial." *Id.* at 175–76.

Missouri nonetheless has not declared Mary Carter agreements invalid. Instead, it has held that:

the surest cure for the ill effects of a Mary Carter agreement is disclosure of its terms to the court and to the jury. The court should, upon motion of a party adversely affected by the settlement agreement, *disclose the existence of and basic terms of the agreement unless* the court finds that disclosure will create substantial danger of undue prejudice or confusion. However, the extent of that disclosure should ordinarily be limited. Mary Carter agreements most often contain information that is impermissibly prejudicial, such as amounts of settlement.... There is little disagreement that such information should be eliminated.

*Carter*, 857 S.W.2d at 178 (emphasis added) (citations omitted).

■ Defendants argue that the settlement agreement was in the nature of a Mary Carter agreement between Plaintiff and Pamela's father and that evidence of the agreement was thus properly revealed to the jury in order to show Plaintiff's bias and for its relevance to the damages claimed by Plaintiff. On appeal, they also assert it was needed to explain Pamela's father's absence during the trial.

We disagree. As noted above, while Mary Carter agreements may take a variety of forms, they all involve settlement by plaintiff with one or more defendants or third-party defendants who then remain in the case but who have an incentive to assist Plaintiff in placing the blame on their co-defendants. Here, plaintiff's settlement agreement was with Pamela's father (her ex-spouse). He was not a party. Moreover, when he sought to intervene, it was as a *plaintiff*, not as a defendant. Finally, as a result of the settlement agreement he did *not* become a party in the case. As a result, there is no danger that the jury would be misled about his bias or prejudice by his settling and remaining in the case for he did not do so. Indeed, he did not even testify as a witness.

We also find that there is no support for defendant's allegation that the settlement agreement should be revealed in order to show bias on the part of plaintiff and for its relevance to damages. It could have no af-

fect on plaintiff's position in the case. There was only one defendant, so the settlement agreement could not create an incentive to put more of the blame on one defendant than on another.

The comparative fault of the Pamela was an issue. However, both before and after the agreement, plaintiff had every incentive to minimize Pamela's fault and to maximize that of defendant; the fact of the settlement did not change this incentive in any degree.

We also find that the settlement agreement was not relevant to the amount of damages to be awarded. As we have noted above, the jury was required to award damages suffered by "the survivors of Pamela O'Neal." Plaintiff did not present evidence that Pamela's father had suffered a loss as a result of Pamela's death. To the contrary, Plaintiff took the position that her ex-husband had been a terrible father to plaintiff, and she did not ask the jury to award any amount for any alleged loss he might have suffered. Moreover, defendant was permitted to fully explore the nature of Pamela's and her father's relationship during trial. No legitimate purpose was served by also admitting evidence of the settlement agreement.

This is not to say that the settlement agreement was not relevant to the apportionment of damages between Plaintiff and the other survivors of Pamela O'Neal. Clearly, it was. As discussed in the preceding section, however, the jury had no say as to how the damages would be apportioned. That issue was separately determined by the court only after trial to the jury to determine the amount of damages. The court was fully aware of the settlement agreement, and no one complains on appeal about the manner in

which he apportioned damages among the survivors of Pamela O'Neal.[2]

■ These factors clearly distinguish the agreement in this case from a Mary Carter agreement. As it was not a Mary Carter agreement, and as other settlement agreements are not admissible, we find it was error for the trial court below to admit evidence of the settlement agreement between plaintiff and Pamela's father in the jury portion of the trial.[3]

### C. *The Giving of Instruction No. 8 Regarding Contributory Negligence of Pamela O'Neal.*

The comparative fault instruction submitted three disjunctive theories of liability: (1) that Pamela O'Neal was following the vehicle in front of her too closely; (2) that she drove at an excessive speed; or (3) that she knew or by the use of the highest degree of care could have known that there was a reasonable likelihood of collision in time to have swerved to avoid the trailer.

■ Each disjunctive alternative submitted in an instruction must be supported by evidence which, if true, would support a verdict for the defendant if the evidence and any resulting inferences are viewed in the light most favorable to the instruction and any contrary evidence is disregarded. *Braniecki v. Mound City Yellow Cab Co.,* 861 S.W.2d 683, 685 (Mo.App.1993).

■ Plaintiff does not claim that a submissible case was not made on the issues of excessive speed and following too closely, but argues that there was no evidence to support the submission of failure to swerve despite the opportunity to do so. Submission of failure to swerve as a separate basis of liability would require proof from which the jury could find that Pamela had sufficient time,

---

2. Neither party raises the issue whether the trial court was bound by the settlement agreement in apportioning damages, and we therefore do not reach that issue. *See* § 537.095.3, RSMo 1986 (stating the court shall determine the losses suffered by each survivor and award damages accordingly). Of course, even if the court were not bound by the settlement, Plaintiff was free to enter into a contract with her former spouse to share a portion of her recovery with him.

3. Even had the agreement in question been a Mary Carter agreement, it would have been error to admit evidence of its amount and of the nature of its negotiation. The jury should only be told of the existence and basic nature of the agreement and further should "be told either by a stipulation or by trial court instruction that the agreement has no bearing on the issue of the parties' respective liability." *Carter,* 857 S.W.2d at 178.

distance, means and ability, considering the movement and speeds of the vehicles, to avoid a collision by swerving. *Id.* at 685–86; *Frazier v. Emerson Elec. Co.,* 867 S.W.2d 700, 702 (Mo.App.1993).

Plaintiff alleges that the evidence only showed that Pamela *would* have had time to swerve *if* she had *not* been driving with excessive speed or following too closely, not that she in fact *did* have time to swerve, and that Defendant improperly submitted and argued the latter alternative to the jury.

 We disagree. Defendant alleges that the evidence supported such a finding. In support, Defendant cites the testimony of Mr. Hammett stating that he saw the brake lights of the O'Neal vehicle come on and go off before the collision and that he believed the O'Neal vehicle successfully avoided the jackknifed truck before he heard the crash. Defendant also cites the testimony of Ms. Young who stated that the O'Neal vehicle was forced into the left lane by a van pulling a trailer 15 to 20 seconds before the collision and at a point when the van with the trailer could see the jackknifed trailer extending into the roadway. This evidence provided a sufficient basis to support the submission of failure to swerve. Assuming that, on remand, sufficient evidence is again presented to support this submission, the phrase, "but [Pamela O'Neal] failed to do so," should not be omitted as was incorrectly done in the instruction submitted below. *See* MAI No. 17.04.

 Plaintiff also complains that the three types of negligent conduct submitted below were contradictory, in that evidence which supported one would negate the others, and therefore all three should not have been submitted together to the jury. We disagree. An instruction for excessive speed may be given if sufficient evidence exists for the jury to determine that the motorist was driving at a speed which, under the circumstances, prevented the party from avoiding a collision. *Braniecki,* 861 S.W.2d at 685–86. An instruction for following too closely may be given if sufficient evidence exists for the jury to determine that the driver was following another vehicle more closely than was reasonably safe and prudent. § 304.017,

RSMo 1986. An instruction for failure to swerve requires proof of a failure to swerve despite an opportunity to do so. Because each type of conduct requires different evidence, and submits a different negligent act, all three of which could have occurred simultaneously, the instructions are not contradictory and could each be given so long as sufficient evidence is provided to submit each issue to the jury.

For the reasons stated above, the case is remanded for a new trial in accordance with this opinion.

LOWENSTEIN, J., concurs.

HANNA, J., concurs in a separate concurring opinion.

HANNA, Judge, concurring.

I agree with the result reached by the majority but disagree with the majority's holding that the trial court erred in admitting evidence of the settlement agreement. Appellate courts give substantial deference to a trial court's decision concerning the admissibility of evidence and that decision will not be disturbed absent a showing of an abuse of discretion. *Oldaker v. Peters,* 817 S.W.2d 245, 250 (Mo. banc 1991).

The trial court permitted a limited inquiry by defense counsel of the relationship between Mr. O'Neal and Pamela through the testimony of Ms. Watts. She testified that they could not talk to each other and that the father wanted nothing to do with Pamela. When counsel asked why, the plaintiff's objection was sustained. No further inquiry was made.

Ms. O'Neal's direct examination, conducted by her attorney revealed in some detail Pamela's relationship with Mr. O'Neal. She explained that they had a poor relationship because Mr. O'Neal never spent any time with Pamela. She described Mr. O'Neal as an alcoholic which led to their divorce. She testified that after their remarriage he "walked off and left us ...," paid no child support, and that Pamela hated him. She made a brief remark that Mr. O'Neal made unwanted advances but declined to discuss the matter further. The message to the jury

was unmistakably clear. Although the court had sustained plaintiff's objection earlier as to why Pamela had no relationship with her father, plaintiff's direct examination discussed this matter at length. In her direct testimony, regardless of the subject matter of the questions, Ms. O'Neal's answers often returned to Mr. O'Neal's failings as a father.

On each occasion when an objection was made by either party, there followed a careful and lengthy discussion of the evidentiary issues. The court's rulings reflected a thoughtful and reasoned compromise of the conflicting positions of the parties. The court ruled that this testimony "open the door" to questions concerning the settlement agreement but excluded any inquiry concerning evidence of the dollar figure or percentage of the settlement between Mr. and Ms. O'Neal.

"The trial court abuses its discretion when its ruling is clearly against the logic of the circumstances then before the trial court and is so unreasonable and arbitrary that the ruling shocks the sense of justice and indicates a lack of careful deliberate consideration." *Id. (quoting Richardson v. Colonial Life & Accident Ins. Co.*, 723 S.W.2d 912, 915 (Mo.App.1987)). It cannot be said here that the trial court's ruling was clearly against the logic of the circumstances and so arbitrary that it shocks the sense of justice and indicates a lack of careful and deliberate consideration.

Generally, evidence of settlement agreements is not admissible in Missouri, because it tends to be highly prejudicial. *Asbridge v. General Motors Corp.*, 797 S.W.2d 775, 781 (Mo.App.1990). This is the rationale when, as is generally the situation, the agreement is between a plaintiff and a defendant. Here the agreement is between two individuals who have a claim under Missouri statute. Under § 537.095.1, RSMo 1994, both Mr. and Ms. O'Neal were entitled to sue for and recover damages for the loss of their daughter. It is difficult to understand what prejudice occurred by the fact that the parties planned to divide any award of damages to which both were entitled.

However, regardless of who makes the agreement, evidence of such agreements is admissible to show bias on the part of a witness. *Hackman v. Dandamudi*, 733 S.W.2d 452, 456 (Mo.App.1986). See *Joice v. Missouri K.T.R. Co.*, 354 Mo. 439, 189 S.W.2d 568, 575 (1945) allowing into evidence a settlement agreement in order to reflect upon an adversarial witness' credibility.

Ms. O'Neal testified on direct examination about the poor relationship between her daughter and Mr. O'Neal. Certainly, her agreement to pay Mr. O'Neal any sum of money for the death of Pamela calls Ms. O'Neal's credibility into question. Why would Ms. O'Neal agree to pay any amount of money to Mr. O'Neal in light of his poor relationship with his daughter? While Ms. O'Neal argued that she made such an agreement solely because she did not want Mr. O'Neal at the trial, it was for the jury to determine her credibility. The evidence was admissible for the reasons advanced. The record reflects the trial court's careful and deliberate consideration as to the legal and logical relevance of this evidence. The trial court carefully balanced the respective interests of the parties. There was no abuse of discretion, and the majority should not have disturbed the trial court's decision to admit a limited inquiry concerning the agreement between Mr. and Ms. O'Neal.